NANNIE HACKWORTH, Executrix of Will Of B. F. HACKWORTH, v. MISSOURI SOUTHERN RAILROAD COMPANY, Appellant.

In Banc, January 29, 1921.

1. **JUDICIAL NOTICE: Matters of General Knowledge.** The courts judicially know the different sections of the State, their products and industries, and that a railroad located in a certain mountainous section of the State has sharp curves and excessive grades, and that a large portion of its business is the transportation of railroad ties.

2. **RAILROAD RATES: Confiscatory: Invalid Statute.** A statute fixing car-load transportation rates cannot be made to apply to a small mountainous railroad when such rates, if observed, would compel it to carry a very large per cent of its car-load traffic at an absolute loss.

3. ———: **Confiscatory Character How Shown.** Railroad rates fixed by a statute are presumed to be non-confiscatory, but their confiscatory character may be made to appear (1) by the fact that the previous rates were much higher, (2) by the direct evidence

Hackworth v. Mo. Southern Railroad Co.

of a railroad expert who by specific calculations shows the cost of service, revenue from statutory rates and losses through the series of years, and (3) by the later rulings of the Public Service Commission fixing higher rates.

4. ————: On Special Articles: Returns from Whole Traffic: Public Policy. That portion of a rate statute which compels a railroad to carry the freight, or the class of freight, therein mentioned, at a loss, although the rates fixed by the law taken as a whole would yield an adequate return, is invalid. If the statutory rate for carrying railroad ties results in an absolute loss to the carrier, the shipper cannot be reimbursed, as for money had and received, for charges for shipping ties in excess of the statutory rate, even though the transportation business of the railroad company as a whole yields a profit. Public policy should not uphold a law which compels one shipper to make good the losses on the shipment of another's goods.

*Held*, by WILLLLIAMS, J., dissenting, that the shipment of the railroad ties, or of any other particular class of commodities, should be considered in connection with all the intra-state traffic on the particular road, and if the net returns for the given years from all such traffic show a reasonable interest on the fair value of the road and all its properties the rates fixed by the statute upon the particular class are not confiscatory, though the company sustains a loss in shipping the commodities of that particular class.

5. LIMITATIONS: Excessive Traffic Charges: Suspension by Pendency of Suit. *Held*, by WILLIAMS, J., in a separate opinion, that the right of a shipper to sue for overcharges in excess of the statutory rate was not suspended by a suit, to which neither the shipper nor defendant railroad company was a party, in the Federal district court, in which said statute was held to be invalid, but which statute upon appeal the United States Supreme Court ruled was not invalid on its face but whether it was invalid when applied to a given railroad depended upon the facts of that particular case; and hence, his action for such excess of charges as were made five years before it was brought was barred by limitations.

6. ————: ————: Action for Overcharge or Penalty. *Held*, by WILLIAMS, J., that the statute fixing a penalty, against a railroad company in favor of the shipper, for freight charges in excess of the statutory rates, did not destroy the shipper's common-law right to sue for such excess of charges, and consequently the shipper's common-law action for overcharges, if brought within five years, was not barred by the three-year Statute of Limitations.

Appeal from Reynolds Circuit Court.—*Hon. E. M. Dearing*, Judge.

REVERSED AND REMANDED.

*J. B. Daniel* and *Arthur T. Brewster* for appellant.

(1)  If the rates prescribed by Sec. 3241, R. S. 1909, for the transportation of railroad ties would not yield to defendant a substantial return upon that portion of the fair value of the property of defendant used in said service, which is properly assignable to that service, that provision of said statute is as to defendant void, irrespective of the return defendant could earn from all of its business, or from all of its intrastate business. Nor. Pac. Ry. Co. v. North Dakota, 236 U. S. 585; Ry. Co. v. West Virginia, 236 U. S. 605.

*Stuart L. Clark* for respondent.

(1)  The rates established by Sec. 3241, R. S. 1909, do not constitute a burden upon interstate commerce, nor any interference therewith. Railroad Co. v. Garrett, 231 U. S. 298, 58 L. Ed. 229; Ferry Co. v. Freeholders, 234 U. S. 317, 58 L. Ed. 1330; Simpson v. Shepard, 230 U. S. 352, 57 L. Ed. 1511; Knott v. Railroad Co., 230 U. S. 474, 57 L. Ed. 1571; Allen v. Railroad Co., 230 U. S. 553, 57 L. Ed. 1625; Ry. & Nav. Co. v. Campbell, 230 U. S. 525, 57 L. Ed. 1604; Ry. Co. v. Conley, 230 U. S. 513, 57 L. Ed. 1597; Ry. Co. v. Grimwood, 220 U. S. 565, 50 L. Ed. 596; Bridge Co. v. Kentucky, 154 U. S. 204, 38 L. Ed. 962.  (2)  Where a shipper has been compelled to pay an excessive charge to a common carrier for the transportation of freight, he may recover the excess in a proper action.  White v. Delano, 270 Mo. 16, 191 S. W. 1012; State ex rel. v. Ry. Co., 265 Mo. 346, 178 S. W. 129, L. R. A. 1916C, 390; Heiserman v. Ry. Co., 63 Iowa, 732, 18 N. W. 903; Graham v. Ry. Co., 53 Wis. 473, 10 N. W. 609; Ry. Co. v. Maddox, 146 Ala. 539; Land Co. v. Railroad Co., 133 S. W. (Ark.) 1119; Reagan v. Loan & Trust Co., 154 U. S. 397, 38 L. Ed. 1014; Railway Co. v. Cotton

Oil Co., 204 U. S. 426, 51 L. Ed. 553; 2 Wyman on Public Service Corp., sec. 1401; 2 Hutchinson on Carriers, sec. 805; 4 Elliott on Railroads, sec. 1564; 6 Cyc. 498. (3) The overcharges in this case may be recovered in an action for money had and received. That action lies where one person has received money belonging to another which in equity and good conscience he ought to refund to the owner. It lies for money paid by mistake; or for money obtained through imposition, express or implied; or through an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances. Moses v. McFerlan, 2 Burrow, 1005; Third Nat. Bank v. Savings Bank, 244 Mo. 554, 149 S. W. 495; Banking Co. v. Comm. Co., 195 Mo. 262, 94 S. W. 527; Henderson v. Koenig, 192 Mo. 690, 91 S. W. 88; Johnson-Brinkman Co. v. Bank, 116 Mo. 558, 22 S. W. 813; Robbins v. Ins. Co., 12 Mo. 380; Sanitary Co. v. Reed, 179 Mo. App. 164, 161 S. W. 315; Lumber Co. v. Dallas, 165 Mo. App. 49, 146 S. W. 95; Roberts v. Neale, 134 Mo. App. 612, 114 S. W. 1120; Richardson v. Drug Co., 92 Mo. App. 515; Deal v. Bank, 79 Mo. App. 262; Dobson v. Winner, 26 Mo. App. 329; Taylor v. Rust, 198 S. W. 194; Whitecotton v. Wilson, 197 S. W. 168; Batson v. Bank, 178 Ala. 490, 60 So. 313; Bank v. Martin, 110 Ark. 578, 163 S. W. 795; Gray v. Ellins, 164 Cal. 481, 129 Pac. 795; Gibson v. Realty Co., 82 Conn. 383, 73 Atl. 765; Savings Bank v. Dismukes, 107 Ga. 212, 33 S. E. 175; Bank v. Gatton, 172 Ill. 525, 50 N. E. 121; Schmidt v. Schmidt, 216 Mass. 572, 104 N. E. 474; Bearce v. Fahrnow, 109 Mich. 315, 67 N. W. 318; Thiele v. Carey, 85 Neb. 454, 123 N. W. 442; Miller v. Schloss, 218 N. Y. 400; Humbird v. Davis, 210 Pa. St. 311; Railway Co. v. Burke, 102 Va. 642; Noble v. Libby, 144 Wis. 632, 129 N. W. 791; Peters v. Railroad Co., 42 Ohio St. 275; Scott v. Jackson, 147 S. W. (Tex. Civ. App.) 336; Pardee v. County, 118 Pac. (Utah) 122; Bank v. Hudson, 74 Ore. 199, 144 Pac. 494; Brooks v. Bank, 26 Okla. 56, 110 Pac. 46; Williams v. Smith, 29 R. I. 562;

Bahsen v. Clements, 79 N. C. 556; Griffin v. Griffin, 20 S. C. 486; Babcock v. Granville, 44 Vt. 325; Jackson v. White, 194 Fed. 677; Lumber Co. v. Bank, 206 Fed. 41, 124 C. C. A. 175; United States v. Engineering Co., 215 Fed. 209; Nash v. Towne, 5 Wall. 689, 18 L. Ed. 527. (4) The right of action given a shipper to recover treble damages under Sec. 3248, R. S. 1909, does not apply to an action to recover for overcharges collected in excess of the rates provided in Section 3241. Section 3248, was enacted in 1875 and was Section 5 of the Act of March 29, 1875, Laws 1875, pp. 112-119, and the remedy therein provided could apply only to violations of the act of which it formed a part. Paddock v. Ry. Co., 155 Mo. 524, 56 S. W. 453; Strottman v. Ry. Co., 211 Mo. 257, 109 S. W. 769; Timpson v. Coal Co., 220 Mo. 591, 119 S. W. 565; Miller v. Boulware, 267 Mo. 487, 184 S. W. 1148; Cobb v. Houston, 117 Mo. App. 651, 94 S. W. 299; McGrew v. Ry. Co., 87 Mo. App. 254. The penalty provided for violations of Section 3241 is found in Section 3242, which was Section 1194a of the Act of March 19, 1907, Laws 1907, pp. 172, 173, and is the only penalty which can be recovered for violations of Section 3241 and no part of that penalty can go to the shipper, but all of it goes to the school fund in the county where the case is tried. If the contention of counsel for appellant be sound, a shipper is left without any remedy to recover excessive charges collected by a railroad company. (5) Even if the provisions of Section 3248 apply to violations of Section 3241, the remedy there given is cumulative and not exclusive. Where the common law gives a remedy and another remedy is given by statute which enlarges the common law remedy, such remedy is cumulative and the plaintiff may pursue either the common law or statutory remedy at his election. Calvert v. Railroad Co., 34 Mo. 243, 38 Mo. 467; Iba v. Railroad Co., 45 Mo. 474; Hill v. Ry. Co., 121 Mo. 477, 26 S. W. 576; Wyckhoff v. Southern Hotel Co., 24 Mo. App. 389; Hill v. Ry. Co., 49 Mo. App. 520; Kingsland v. Forest, 18 Ala.

519, 52 Am. Dec. 232; Joffa v. Fidelity Co., 7 Ala. App. 206; Wells v. Steele, 31 Ark. 215; Gilbert v. Peck, 162 Cal. 54, 121 Pac. 215; Milling Co. v. Mitchell, 26 Colo. 284, 58 Pac. 28; Ry. Co. v. Kennedy, 12 Conn. 299; Randel v. Shoemaker, 1 Harr. (Del.) 565; Futch v. Adams, 47 Fla. 257; Doe v. Ry. Co., 1 Ga. 524; Ry. Co. v. Chicago, 148 Ill. 141, 35 N. E. 881; Barnett v. Van Meter, 7 Ind. App. 45; Board of Education v. Scovill, 13 Kan. 17; Richardson v. Ins. Co., 28 Ky. L. 919, 92 S. W. 294; Hays v. Porter, 22 Me. 371; Turnpike Road v. State, 19 Md. 239; Pollock v. Ry. Co., 124 Mass. 158; Bellant v. Brown, 78 Mich. 294, 44 N. W. 326; State v. Cosgrave, 85 Neb. 187, 122 N. W. 885; State v. Railroad, 62 N. H. 29; Coxe v. Robbins, 9 N. J. L. 384; Plank Road Co. v. Marley, 23 N. Y. 552; Bowles v. Neeley, 28 Okla. 556, 115 Pac. 344; Luder v. State, 152 S. W. (Tex. Civ. App.) 220; Gibbes v. Beaufort, 20 S. C. 213; Levy v. Davis, 115 Va. 814; Atkinson v. Oil Co., 79 S. E. (W. Va.) 647; Field v. Milwaukee, 154 N. W. (Wis.) 698; Bergman v. Gay, 79 Vt. 252. (6) The testimony taken before the Public Service Commission in 1914 upon the application of appellant for an increase in all its rates does not tend to prove that the statutory rates prescribed by Section 3241 would have been confiscatory if applied to the shipments made over the line of road in 1909, 1910 and 1911 when the shipments here in controversy were made. The proceeding before the Public Service Commission was legislative in character and not judicial. Railroad Co. v. Public Service Com., 214 S. W. 379; State ex rel. v. Johnson, 61 Kan. 803, 60 Pac. 1068; Gulf C. Co. v. Harris, 158 Ala. 343, 48 South. 477; Shepard v. Wheeling, 30 W. Va. 479; Western Union Tel. Co. v. Myatt, 98 Fed. 335; Spring Valley Waterworks v. San Francisco, 124 Fed. 574; Ross v. Oregon, 227 U. S. 150, 57 L. Ed. 458; Interstate Commerce Com. v. Ry. Co., 218 U. S. 110, 54 L. Ed. 946; Prentiss v. Atlantic Coast Line Ry. Co., 211 U. S. 210, 53 L. Ed. 150; Home Tel. Co. v. Los Angeles, 211 U. S. 265, 53 L. Ed. 175; San Diego Co. v.

Jasper, 189 U. S. 437, 47 L. Ed. 892; McChord v. Ry. Co., 183 U. S. 483, 46 L. Ed. 289; 2 Wyman on Public Service Corp., Sec. 1402; Reeder on Validity of Rate Regulation, sec. 34. (7) Whether the statutory rates, if charged and collected during the time the shipments in controversy were made, would have been confiscatory at that time can only be determined by the court upon an original, independent investigation of conditions at that time, and not by an examination of the proceedings had before the Public Service Commission from three to five years later. Spring Valley Waterworks Co. v. San Francisco, 124 Fed. 574. (8) What the appellant was entitled to receive was a reasonable return upon the fair and reasonable value of its property used and usable in the public service during the time the shipments in controversy were made. Puget Sound T. L. & P. Co. v. Reynolds, 244 U. S. 574; Ry. Co. v. Finn, 235 U. S. 607; Ry. Co. v. Garrett, 231 U. S. 298, 58 L. Ed. 229; Wood v. Railroad Co., 231 U. S. 1, 58 L. Ed. 97; Simpson v. Shepard, 230 U. S. 352, 57 L. Ed. 1511; Louisville v. Tel. Co., 225 U. S. 430, 56 L. Ed. 1151; Wilcox v. Gas Co., 212 U. S. 19, 53 L. Ed. 382; Knoxville v. Water Co., 212 U. S. 1, 53 L. Ed. 371; San Diego Co. v. Jasper, 189 U. S. 437, 47 L. Ed. 892; San Diego Co. v. National City, 174 U. S. 739, 43 L. Ed. 1154; Tel .Co. v. Carthage, 235 Mo. 644, 139 S. W. 547; Tel. Co. v. Westenhaver, 29 Okla. 429, 148 Pac. 354; G. & E. Co. v. Cedar Rapids, 144 Iowa, 426, 120 N. W. 966; State ex rel. v. Railroad Co., 80 Minn. 191, 83 N. W. 60; Steenerson v. Ry. Co., 69 Minn. 353, 72 N. W. 713; Griffin v. Water Co., 122 N. C. 211; Kennebec Water Dist. v. Waterville, 97 Me. 185; Commission v. Water Company, 70 N. J. Eq. 71; Beale & Wyman on Rate Regulation (2 Ed.), sec. 968; Reeder on Validity of Rate Regulation, sec. 155. (9) Where a complete schedule of rates on all kinds and classes of traffic is established by state authority, the carrier cannot single out a particular class or commodity and complain that the rate prescribed for transportation

of that class or commodity, considered alone, compels it to carry it without sufficient profit, or even at a loss, where the evidence tends to show that the carrier receives a reasonable return on all its property from the application of the entire schedule of rates. State ex rel. Pub. Service Com. v. Mo. Southern Railroad Co., 214 S. W. 385; City of Newark v. Gas & F. Co., 92 Ohio St. 293, 242 U. S. 405; Puget Sound T. L. & P. Co. v. Reynolds, 244 U. S. 574; Wilcox v. Gas Co., 212 U. S. 19, 53 L. Ed. 382; Atlantic Coast Line Ry. Co. v. Corp. Comm., 206 U. S. 1, 51 L. Ed. 933; San Diego Co. v. National City, 174 U. S. 739, 43 L. Ed. 1154; Turnpike Road Co. v. Sandford, 164 U. S. 578, 41 L. Ed. 560. (10) The final decree of the United States District Court for the Western District of Missouri, holding Section 3241, R. S. 1909, to be unconstitutional, was entered and in full force when the first shipment here in controversy was made and continued in force during all the time they were being made, and the plaintiff could not attack that decree collaterally in any state court by seeking to recover the difference between the statutory rates which were presumed to be reasonable and the rates demanded and collected from him, when the question of what would be the basis of his recovery was left in doubt by the decree. The United States District Court had jurisdiction, and by its decree, retained jurisdiction of all subject-matter pending the hearing on appeal in the United States Supreme Court, and this jurisdiction ousted that of all state courts so that the plaintiff had no forum in which to litigate his demand, and until that disability was removed, the Statute of Limitations would not run. State ex rel. v. Williams, 221 Mo. 254, 257, 120 S. W. 740; Ex parte Young, 209 U. S. 123, 166, 52 L. Ed. 714, 731; Ry. Co. v. Minnesota, 134 U. S. 460, 33 L. Ed. 970, 982.

GRAVES, J.—B. F. Hackworth, to the May Term, 1915, of the Reynolds County Circuit Court, instituted his action in 748 counts, against the defendant, for alleged overcharges in the shipment of railroad ties. The

286 Mo.—19

several counts are in the nature of actions for money had and received, and so the judgment runs. Upon trial the plaintiff dismissed as to 15 counts, and had judgment on the remaining counts, in the aggregate sum of $10,572.36, with interest thereon at six per cent per annum from February 23, 1915. The amount sued for in each count was the difference between the freight rate fixed by Section 3241, Revised Statutes 1909, and the rate actually charged.

The answer was (1) a general denial, (2) a plea that the rates fixed by said Section 3241 were confiscatory and violative of stated provisions of the Federal Constitution, as well as stated provisions of the State Constitution, (3) the five-year Statute of Limitations was invoked as to certain counts, and (4) the three-year Statute of Limitations, Section 1890, was likewise invoked as to all of the counts. This paragraph was stricken out upon motion of plaintiff. The shipment of ties ran through the years (or parts of years) 1909, 1910 and 1911.

By reply plaintiff sought to evade concededly outlawed counts, by pleading the pendency of the Missouri Rate Cases, in the courts of the United States, and averred that the statute would not run against him until the U. S. Supreme Court decided the validity of Section 3241, supra, on June 16, 1913, the enforcement of the statute having been stayed by injunction in such rate cases. Defendant was not a party to such cases, nor was the plaintiff herein.

From the judgment indicated the defendant has appealed. The present plaintiff is the executrix of the will of B. F. Hackworth, now deceased. This outlines the case.

I. The railroad in question is in a rough mountainous section of the State, and has sharp curves and excessive grades. A large portion of its business is the transportation of railroad ties. In fact this court would

have to judically know the character of the country and its products. Of matters of state history, the courts are not more ignorant than the general public. Judicial knowledge of facts is measured by general knowledge of the same facts. We judicially know the different sections of our State, its products and industries, because such are taught in the schools, and are matters of general knowledge. But the evidence in this case shows that a very large per cent of this railroad's business was carload shipments of railroad ties.

Defendant has challenged the validity of the Act of 1907, now Section 3241, Revised Statutes 1909, as applied to it, in the matter of the rates on railroad ties, as fixed by such act. This upon the ground that they are confiscatory, in that they are and during the years herein involved, brought to the railroad less money than it expended in the hauling of the ties. In 1907, this road did not have mileage enough to place it within Class C as railroads were then and are now classified. [Revised Statutes 1909, sec. 3231.] The Act of 1907, now Section 3241, Revised Statutes 1909, did not then apply to it, so that it had no part or parcel in the Missouri Rates Cases. In 1909, and before the shipment of the ties herein involved, its mileage exceeded 45 miles, and it thereupon fell within the terms of said Section 3241. Its present mileage but little more than brings it within the statute, supra, i. e. 54 miles of main line, 10 miles of branch lines and 5 miles of sidings and spur tracks. Its line is in a tie, lumber and wood district of the State.

Up to 1913, schedules of rates, within the statutory maximums, were fixed by the Railroad and Warehouse Commissioners. Since 1913, they have been fixed by the Public Service Commission, under the Act of 1913, Laws of 1913, page 557 et seq.

Counsel have by the following table shown the rates on railroad ties, both before and after the Act of 1907, now Revised Statutes 1909, Section 3241. This table shows:

Hackworth v. Mo. Southern Railroad Co.

"Rates on Ties and Lumber, 1905 to 1919, in Cents Per Cwt.

| Distance not exceeding miles | 5 | 10 | 15 | 20 | 25 | 30 | 35 | 40 | 45 | 50 | 55 | 200 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1905** | | | | | | | | | | | | |
| Lumber | 5 | 5 | 5 | 5 | 5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 6 | 9 |
| Ties | 2 | 2 | 3 | 3 | 3.25 | 3.25 | 3.50 | 3.50 | 3.75 | 3.75 | 4 | 7.75 |
| **1907** | | | | | | | | | | | | |
| Lumber | 5 | 5 | 5 | 5 | 5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 6 | 9 |
| Ties | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2.25 | 6 |
| **1915** | | | | | | | | | | | | |
| Lumber | 4 | 4.2 | 4.4 | 4.6 | 4.8 | 5 | 5.1 | 5.3 | 5.4 | 5.6 | 5.8 | 9.4 |
| Ties | 2.5 | 2.7 | 2.9 | 3.1 | 3.3 | 3.5 | 3.6 | 3.8 | 3.9 | 4.1 | 4.3 | 7.9 |
| **1917** | | | | | | | | | | | | |
| Lumber | 4.6 | 5 | 5.4 | 5.8 | 6.1 | 6.4 | 6.6 | 6.9 | 7.1 | 7.4 | 7.7 | |
| Ties | 3.1 | 3.5 | 3.9 | 4.3 | 4.6 | 4.9 | 5.1 | 5.4 | 5.5 | 5.9 | 6.2 | |

From this table it appears that both before and after the Act of 1907, the rate on ties for this short road was much more favorable than those fixed by the Act of 1907. The rate fixed in 1907, quoting from Section 3241, is:

"For a carload of 40,000 pounds of minimum weight undressed stone, crushed rock, sand, railroad ties, cord wood, building or paving brick, not exceeding 40 cents per ton of 2,000 pounds to the ton for the first fifty miles or fractional part thereof, and not exceeding five cents per ton per carload for the next ten miles or fractional part thereof, and not exceeding five cents per ton per carload for each additional ten miles or fractional part thereof. In computing the rate of freight according to the provisions of this article, the distance shall be computed from the point where it is received to the point of destination in the State, notwithstanding it may pass from one road to another."

The rates prior to 1907 were rates fixed by the Missouri Railroad and Warehouse Commissioners. From 1915 on, the rates are those fixed by the Public Service Commission, under the Act of 1913, supra. Those for 1915 were fixed in the case of In re Southern Railroad Company, 3 Public Service Commission Reports, l. c. 66. This proceeding was begun in 1914.

Hackworth v. Mo. Southern Railroad Co.

By an expert in this case it is shown that the hauling of ties at the statutory rate would have entailed a loss upon this carrier, as follows:

| Years | Cost of Service | Revenue from Statutory Rates | Loss from Operation |
|---|---|---|---|
| 1910 | $11,400.25 | $7,918.97 | $3,481.27 |
| 1911 | 13,596.26 | 9,028.25 | 4,568.01 |
| 1912 | 10,677.31 | 6,647.43 | 4,029.88 |
| 1914 | 29,454.31 | 18,346.10 | 11,108.21 |

In fact it is not seriously questioned that the statutory rate, fixed by Section 4231, supra, would have entailed a loss upon the defendant during the years covered by this suit. It is urged by counsel for plaintiff that this record does not show that the road was not getting fair returns upon its investment, notwithstanding this loss upon railroad ties. If the matter reaches this point, those facts can be dealt with later. This matter is practically disposed of by the briefs filed In Banc. To this point we have this simple question: can this statute, as applied to this defendant, stand, when the rates fixed therein compel the defendant to carry a very large per cent of its carload traffic at an absolute loss? Of this next.

II. As stated above, it is not seriously contended that the hauling of railroad ties, at the rate fixed by Section 4231, supra, would have been a losing game for this short railroad.

It is presumed to be non-confiscatory, until its confiscatory character is made to appear. Its confiscatory character is made to appear (1) by the fact that the previous rate (likewise presumed to be reasonable) was much higher, (2) by the direct evidence of a railroad expert, who according to well established railroad rules, made the specific calculations set out in the statement, and (3) by the later rulings of the Public Service commission. Upon the question now for determination, suggested at the close of the previous paragraph, learned counsel for plaintiff in his Divisional brief says:

"Appellant also invokes the rule laid down in the North Dakota rate cases (Northern Pacific Railway Co. v. North Dakota, 236 U. S. 585, 59 L. Ed. 735, 35 Sup. Ct. Rep. 429, Ann. Cas. 1916A, 1), that the State cannot require it to transport any class of traffic where it is shown that it would be required to transport the same at a loss, or without sufficient return upon that class alone to give it a fair return upon that property devoted to the transportation of the class of traffic in question. It is the theory of respondent, sustained by the trial court, that this rule can only be invoked where the State segregates from the entire mass of traffic, a single commodity or class of traffic and prescribes rates which, considering that traffic alone, do not yield a reasonable return, and that where the State has prescribed and established a complete schedule of rates affecting all traffic, the rule stated in the North Dakota rate cases cannot apply; that where the State has prescribed a complete schedule of rates affecting all traffic, as was done in Section 3241, supra, it must be shown that the rates, considered in their entirety, are not sufficient to yield a reasonable return upon the property used in the public service at the time it is being so used. That confiscation of property is not shown where the corporation may be required to perform certain service at an insufficient profit, or even at a loss, when the entire schedule of rates may yield a sufficient return upon all the property used in the public service."

Contra, the appellant counsel plants his case (on this point) upon his conception of the rules announced by Mr. Justice Hughes in North Pacific Ry. Co. v. North Dakota, 236 U. S. 585, and another case by the same learned justice, about the same date. For this court the case is one of first impression.

Can a valid rate law be passed, which, when applied to a common carrier, will compel such carrier to haul a large per cent of its freight at a clear loss, simply because the other rates named in the state law, will

make up that loss, and in addition allow a reasonable return upon the investment? This is the broad question at the threshold of this case. In the language of appellant's counsel it is thus stated:

"The theory on which this case was tried, as well as the theory on which it was presented to Division Two of this court, by both parties, was that appellant contended that if the revenue which would have been derived from the application of the rates prescribed by Section 3241 to the shipments in question would not have yielded any substantial return upon the property properly assignable to that traffic after paying proper costs of operation, then the statute was as to appellant confiscatory and void, while counsel for respondent contended that in order for appellant to escape the mandate of the statute it must show that all the revenue which it would have derived from all intrastate traffic mentioned in said Section 3241 would not yield to it a reasonable return upon the property of appellant properly assignable to such intrastate traffic. A decision of this question of law determines the question now under consideration, for there was no attempt on the part of appellant to show what return was or would have been received from all the intrastate traffic mentioned if the rates prescribed in said Section 3241 had been applied thereto; neither was there any attempt on the part of counsel for respondent to show that the rates charged and collected by appellant were unreasonably high other than to show that they were higher than those prescribed by the statute aforesaid, nor were there any allegations that the rates charged were unreasonably high."

In his brief before Court in Banc counsel for respondent quotes the foregoing, and adds that the respective theories of counsel is correctly stated by counsel for appellant. Stating the proposition differently, can a state law be confiscatory as to a given class of freight, and yet stand as to such confiscatory portion, because by other provisions Jones is made to pay Smith's legiti-

mate freight? The proposition does not savor of sound reason, if it is to be answered in the affirmative.

It is always true, that the question of whether or not a statute fixing rates is confiscatory, is a question of fact (Missouri Rate Cases, 230 U. S. 1. c. 508), but in this case the confiscatory character of this portion of Section 4231 is not seriously questioned. We mean by this, that there is no doubt that the rate fixed by this statute, so far as the hauling of railroad ties is concerned, was confiscatory as to this defendant. Defendant would have been hauling them at a loss. For the single issue which counsel upon both sides admit to be the issue here, this will suffice. Appellant contends that we should declare this portion confiscatory and void, for the reasons stated, whilst respondent contends that there has been a failure to show that the whole scheme of rates was confiscatory, and therefore defendant's defense fails.

Counsel for respondent cite us to the cases of Minnesota Rate Cases, 230 U. S. 1. c. 433; Knoxville v. Knoxville Water Co., 212 U. S. 1, and San Diego Land & Town Co. v. Jasper, 189 U. S. 439, but these cases do not go to the single and simple issue here. Lest we forget, let us reiterate the issue here. Is that portion of a state rate law valid which compels a railroad to carry the freight, or the class of freight, therein mentioned, at a loss, although it be admitted that the rates under the law, taken as a whole, would give adequate returns? This is the question here. Public policy should not stand for law which compels Jones to make good the losses on Smith's freight.

The ruling in North Pacific Railway Co. v. North Dakota, 236 U. S. 585 et seq., in our judgment settles this case. The court there had under consideration Chapter 51 of the Laws of 1907 of North Dakota. This law of 1907, Laws of North Dakota, 1907, page 73, is amended Section 4395 of the Revised Code of 1905. In the Code of 1905, this Section 4395 appears in Article 10 of such code, entitled: "To Regulate Common Car-

ries and Define the Duties of The Commissioners of Railroads.'' In the said Article 10, Code of 1905, the Commissioners of Railroads, by Section 4343, are empowered to fix maximum schedules of rates for the railroads of the State, and to this end were empowered to classify freight. Section 4395 of Article 10, Code of 1905, fixed the maximum rates for coal, and these maximum rates so fixed were, by the Act of 1907, Chapter 51, further lowered. The Northern Pacific and two other roads named in the opinion, refused to put the rates in force, for that such rates compelled them to carry coal at a loss. The case was decided *nisi* on the theory that, if all the intrastate business of these roads gave them returns upon their property, then such roads could not complain of carrying coal at a loss. The roads tried the case upon the theory that they could not be compelled to carry any particular article, or class of freight, at a loss. The state court found, in its way of figuring, that the Northern Pacific made some $847 in twelve months on coal. The other roads carried at a loss. By the state court the roads, by mandatory injunction, were compelled to put in force the statute, and this ruling Mr. Justice HUGHES reversed as to all three of the roads. The returns of other articles or classes of articles were not gone into in these cases. At page 594 of 236 U. S. Report, Mr. Justice HUGHES outlines the holdings of the state court upon the law, as follows:

"As to the law, the state court held:

" '(a) The statutory freight rate is presumed to be reasonable, which presumption continues until the contrary appears, and the rate is shown beyond a reasonable doubt to be confiscatory.

" '(b) Proof that a rate is non-compensatory— that is, while producing more revenue than sufficient to pay actual expenses occasioned by the transportation of the commodity, but insufficient to also reimburse for that proportion of the railroad's fixed or overhead costs properly apportionable to such commodity carried— is not

sufficient to establish that the rate is confiscatory in law. .

" '(c) In order to establish such a non-compensatory rate to be confiscatory, it must further appear that any deficit under the rate affects the net intrastate freight earnings materially, and reduces them to a point where they are insufficient to amount to a reasonable rate of profit on the amount of the value of the railroad property within the state contributing to produce such net earnings.'

"Accordingly, it was further held that, after establishing the value of the property employed in the production of the net intrastate freight earnings, it must appear, in order to show confiscation, either (1) that such earnings are insufficient to yield a fair return upon that value and that the commodity in question is carried for less than what is sufficient to meet all expenses, including 'out-of-pocket costs' and fixed charges, or (2) that the loss on the commodity under the rate attacked 'reduces the balance of the net intrastate freight earnings' to a point where, including the loss on the commodity rate, they fail to yield such return. [26 N. Dak. p. 440.]"

Speaking to the issue here involved, Mr. Justice HUGHES, at page 595 et seq., says:

"But, broad as is the power of regulation, the State does not enjoy the freedom of an owner. The fact that the property is devoted to a public use on certain terms does not justify the requirement that it shall be devoted to other public purposes, or to the same use on other terms, or the imposition of restrictions that are not reasonably concerned with the proper conduct of the business according to the undertaking which the carrier has expressly or impliedly assumed. If it has held itself out as a carrier of passengers only, it cannot be compelled to carry freight. As a carrier for hire, it cannot be required to carry persons or goods gratuitously. The case would not be altered by the as-

sertion that the public interest demanded such carriage. The public interest cannot be invoked as a justification for demands which pass the limits of reasonable protection and seek to impose upon the carrier and its property burdens that are not incident to its engagment. *In such a case, it would be no answer to say that the carrier obtains from its entire intrastate business a return as to the sufficiency of which in the aggregate it is not entitled complain.''*

The italics are ours.   Again at page 598 the learned justice further says:

''The State insists that the enactment of the statute may be justified as 'a declaration of public policy.'   In substance, the argument is that the rate was imposed to aid in the development of a local industry and thus to confer a benefit upon the people of the State.   The importance to the community of its deposits of lignite coal, the infancy of the industry, and the advantages to be gained by increasing the consumption of this coal and making the community less dependent upon fuel supplies imported into the State, are emphasized.   But, while local interests serve as a motive for enforcing reasonable rates, it would be a very different matter to say that the State may compel the carrier to maintain a rate upon a particular commodity that is less than reasonable, or—as might equally well be asserted—to carry gratuitously, in order to build up a local enterprise.   That would be to go outside the carrier's undertaking, and outline the field of reasonable supervision of the conduct of its business, and would be equivalent to an appropriation of the property to public uses upon terms to which the carrier had in no way agreed. It does not aid the argument to urge that the State may permit the carrier to make good its loss by charges for other transportation.   If other rates are exorbitant, they may be reduced.   *Certainly, it could not be said that the carrier may be required to charge excessive rates to some in order that others might be served at a rate unreasonably.*

*low. That would be but arbitrary action. We cannot reach the conclusion that the rate in question is to be supported upon the ground of public policy if, upon the facts found, it should be deemed to be less than reasonable.''*

At page 601 appears this significant remark from the learned justice:

''It has repeatedly been assumed in the decisions of this court, that the State has no arbitrary power over the carrier's rates and may not select a particular commodity or class of traffic for carriage without reasonable reward.''

As I read this opinion from our highest court, and the one which has the power of final action upon the Federal question herein involved, the theory of the trial court in the instant case was wrong. Both counsel agree as to the theory of the trial below, and that theory contravenes the rule in North Pacific Railway Co. v. North Dakota, supra. Under the conceded facts this rate upon railroad ties was so inadequately low as to be confiscatory. It is a wholesome rule for the State, in making rates, to obviate a rate which will compel the carrying of a commodity at a loss. If the State can do that, it can compel some commodities to be carried free, and give the railroad fair net earnings by having high rates on other commodities. In these days of enlightened rate experts, it is not hard to determine whether or not a given rate upon a particular commodity will bear its reasonable proportion toward a fair income from a whole schedule of rates, after paying its legitimate proportion of carriage cost. Nor is it hard to determine, in these days, whether a given rate upon a particular commodity entails loss upon the carrier. The rate in question here is confiscatory under the conceded facts and the Federal rulings, and when the Federal Constitution is applied that portion of the law must fall.

Since the hearing in Division both counsel in their briefs say this is the sole question for determination, and other matters need no further notice.

The judgment is reversed, and the cause remanded to be disposed of in accordance with this opinion. All concur, except *Williams, J.,* who dissents and adopts the opinion of *White, C.,* in Division No. 2 as his dissenting opinion.

WILLIAMS, J. (dissenting).—I dissent from the conclusion reached in the foregoing opinion, and hereby adopt as my own the opinion of Mr. Commissioner WHITE delivered in Division Two. Said opinion is as follows:

The plaintiff, executrix of the will of B. F. Hackworth, deceased, brought this suit for alleged overcharges which the defendant collected from B. F. Hackworth for the shipment of ties over its road. The petition contained 748 counts. Plaintiff dismissed as to fifteen counts, and recovered judgment on the remainder, amounting in the aggregate to $10,572.36. The amount prayed for in each count of the petition was the amount charged in excess of the rates provided by Section 3241, Revised Statutes 1909, and collected by the defendant for a particular shipment of ties.

After a general denial, the defendant for answer averred that the charge alleged to have been collected for services rendered by the defendant were reasonable and proper, and that the rates prescribed by Section 3241 were in violation of several enumerated sections of the Constitution of the United States and of the State of Missouri, in that they operated as a confiscation and deprived the defendant of its property without due process of law.

Defendant further set up the five-year Statute of Limitations in defense of 127 counts of the petition; also the three-year Statute of Limitations, Section 1890, Revised Statutes 1909, as to all the counts of the petition, in that the action was for penalties.

The plaintiff, in reply to the pleas of the Statutes of Limitations, alleged that before the charges were collected an injunction was granted by the United States

Circuit Court of the Western District of Missouri in favor of certain railroads in the State of Missouri, whereby the Railroad and Warehouse Commissioners and the Attorney-General of the State of Missouri were restrained from enforcing the provisions of Section 3241, Revised Statutes 1909, and that such injunction remained in force until the judgment was reversed by the Supreme Court of the United States in 1913, and during that time the plaintiff was unable to sue and the Statutes of Limitations did not run.

The defendant's road did not exceed forty-five miles in length until May, 1909, when it was extended to the length of fifty-four miles of main line, besides branches, etc. At that time the rate act, including Section 3241, was in force. By the extension in 1909 the defendant's railroad was brought within Class C, as defined by Section 3231, Revised Statutes 1909, so that the rates provided by Section 3241, Revised Statutes 1909, were applicable to the traffic on defendant's road. The aggregate amount sued for in the 127 counts to which defendant seeks to apply the five-year Statute of Limitations was $1401.19. There was a judgment on all counts except those dismissed. Seven of the fifteen dismissed were among those to which the five-year Statute of Limitations was pleaded, leaving 120 counts in which that issue was joined. The defendant appealed from the judgment. The facts in record as they pertain to the different points presented will be considered in their order.

The records of the proceedings of the Federal Circuit Court, pleaded in plaintiff's reply, was not introduced in evidence, but this court may take judicial cognizance of it as a matter of current history. [State ex rel. v. Public Service Commission, 259 Mo. 704, l. c. 726; St. L. & S. F. Ry. Co. v. Hadley, 168 Fed. 317; Missouri Rate Cases, 230 U. S. 474.]

I. The plaintiff relies upon the case of State ex rel. v. Williams, 221 Mo. 227, in support of her position that

the Statute of Limitations did not run because the plaintiff could not sue the defendant in this case while the injunction in the Federal court remained in force. A suit was brought by Mr. Jones, the Circuit Attorney of the City of St. Louis, against certain railroads that were parties to the proceeding in the Federal court, seeking to enjoin them from collecting fares in excess of the statutory rate. The defendants then began the proceeding in this court, State ex rel. v. Williams, to prevent by prohibition a prosecution of the injunction suit in St. Louis, and this court awarded a peremptory writ. The opinion expressly placed the ruling upon the ground that the parties to the two suits were the same; the parties to the suit in St. Louis, where it was sought to enjoin the charging *in excess* of the statutory rate, were the same parties in effect as the parties to the suits in the Federal court where the *enforcement* of the statutory rate was enjoined. Inasmuch as the Federal court had first acquired jurisdiction of the parties and of the subject-matter of the suit, which affected the constitutionality of the statute, this court would not interfere, but let the matter proceed to final determination in the Federal court. While the Attorney-General, and the Railroad & Warehouse Commissioners, of Missouri, were the nominal parties defendant to the suits in the Federal court, those officials of the State represented the passengers and shippers whose interests or rights might be affected, so that the real parties in interest were shippers or passengers over any of the railroads involved, and the Circuit Attorney of Louis in the suit brought by him represented the same shippers and passengers. The opinion says, l. c. 254:

"Thus we have two cases in courts of co-ordinate jurisdiction where the power of the courts is being exercised between *practically the same* parties in interest, to-wit, the carriers on one hand and the shippers and passengers on the other, upon the same subject-matter, and the two courts are thus brought in conflict with each other."

*Limitations.*

Plainer language could hardly be used by the court to show that the ruling was distinctly upon the ground of identity of parties. None of the parties to the present suit were parties to that injunction suit in the Federal court. The defendant railroad company was not a party, and, at the time the judgment was rendered in the Federal Circuit Court, it was not of sufficient length to bring it within the provisions of Section 3241, but was built to the requisite length in 1909. Not only that, the plaintiff here was not a party to that injunction suit,— the real parties there, represented by the officials *were the shippers and passengers over the railroads who were parties to that suit;* they were not shippers and passengers, as such, over the *railroad of defendant in this case.*

Appellant, however, claims that inasmuch as there was a judgment by a Federal court having jurisdiction, holding the statute unconstitutional, after that decree was entered, there was no statutory maximum-rate law in force in this State until the decree was reversed by the United States Supreme Court. This on the theory that the doctrine should be applied as laid down in several decisions; where a statute has been declared unconstitutional or constitutional by a court of last resort its constitutionality ceases to exist as an open question. [Schmidt v. United Order of Foresters, 259 Mo. 491, l. c. 497; State v. Finley, 259 Mo. 414, l. c. 422; Non-Royalty Shoe Co. v. Phoenix Assur. Co., 210 S. W. 37, l. c. 43; and cases of like import.] In those cases it was held no longer permissible to raise a constitutional question so as to confer jurisdiction upon this court. If that principle could be applied to this case, where the statute was held unconstitutional by the Federal Circuit Court, not a court of last resort, so that everybody would be bound by that decree while an appeal was pending in the United States Supreme Court (which we do not by any means concede), the issues determined in the railroad-rate case would not support the position. The rate

cases, eighteen in number, were determined in one opinion. [St. Louis & S. F. Ry. Co. v. Hadley, 168 Fed. 317.] The Federal Circuit Court in that case held, page 347, that the statutes, such as the one under consideration, "should be declared valid or void as the *facts* might warrant," and said, at page 348:

"Therefore the holding is that these *statutes are not void upon their face,* and cannot be declared void for the one reason that the evidence shows they are not enforcible as to two or more roads." (Italics ours. And further, on page 352:

"This leaves but one question for decision and that question largely one of fact."

The court then proceeded to consider the evidence and held the statute to be confiscatory and unconstitutional because of the facts shown in regard to the investment and earnings of the *particular roads* which were parties to the eighteen suits. When the case reached the Supreme Court, 230 U. S. 474-509, et seq., it held, *under the facts,* that the rate statute was not shown to be confiscatory as to some of the railroads, while as to others it was. None of those eighteen railroads relied upon a judgment in favor of any of the others as being conclusive. Each relied upon the ruling in its own particular case. Thus, according to the ruling in the Federal Circuit Court, as well as in the Supreme Court of the United States, Section 3241 is confiscatory or otherwise, constitutional or unconstitutional, not upon its face, but upon the facts shown and applied to a particular road. Otherwise, if the statute had been held constitutional upon its face by the Supreme Court of the United States so as to remove all questions as to its constitutionality, then the plaintiff in this case might have pleaded that judgment as settling once for all the question of the confiscatory or fair quality of the rates as applied to the defendant's railroad and there would be no necessity of inquiring into the facts in this case.

286 Mo.—20

So we hold that the plaintiff might have brought his suit against the defendant at any time after the overcharges were made.

It remains to consider whether the three-year Statute of Limitations which would bar all counts of plaintiff's petition. or the five-year Statute of Limitations, which would bar 120 counts, should be applied, and that question turns upon whether the plaintiff is suing at common law for excessive charges or for the penalty provided by Section 3248, Revised Statutes 1909.

II. Of the statutes with which we have to deal, Section 3241, Revised Statutes 1909, provides a maximum freight rate and the suit is in form a common law action for the amount charged and collected in excess of that rate. The appellant asserts the petition sufficiently states a cause of action for recovery of the penalty mentioned in Section 3248 in the same article and chapter. That section provides that a corporation making such overcharge shall ''forfeit all right to recover or receive any compensation'' and may be convicted of a misdemeanor and fined not exceeding $200 for each offense. The party injured may bring action against the railroad company in such case and ''be entitled to recover three times the amount taken or received from him in excess of the rate prescribed by this article.''

While it is admitted that ordinarily an action at common law could be maintained for charging and collecting for carrying freight, more than the service was reasonably worth, appellant claims the statutes just mentioned afford exclusive remedies and repeal the common law upon the subject. It is necessary to call attention to some of the principles laid down in the books applicable to the matter in hand.

An action will lie at common law to enforce a remedy for neglect of a statutory duty. [McCaskey v. Railroad, 174 Mo. App. 724, l. c. 726.] Where the statute creates a new right and provides a remedy for its enforcement the remedy is exclusive. [Chandler v. Railroad, 251

Mo. 592, l. c. 600; City of Clinton ex rel. v. Henry County, 115 Mo. 557, l. c. 569.] But where there is already a right of action at common law, and the statute provides an additional remedy the remedy is only cumulative and the remedy at common law still obtains.

"When the statute creates a special duty, for the neglect of which a common-law action would lie, that action is not forbidden by the fact merely that an extraordinary liability in the nature of a penalty is also provided. The latter is only cumulative." [Iba v. Railroad, 45 Mo. 469, l. c. 474; Hill v. Railway, 49 Mo. App. 520, l. c. 528; Hill v. Railway, 121 Mo. 477, l. c. 482.]

Where the statute merely enlarges the right which existed at common law it will not be deemed to have repealed the common-law remedy; but if the statute restricts the right and provides a remedy for its enforcement it is exclusive. [Wyckoff v. Hotel Co., 24 Mo. App. 382, l. c. 388-9.] That case is an instructive illustration of the principle. It was an action to enforce an innkeeper's lien. The statute provided a lien for innkeepers and stated the subjects to which the innkeepers' lien would apply, including some articles for which the common law did not allow a lien to innkeepers and excluding some to which the common-law innkeepers' lien would apply. Since it enlarged the right in some respects and restricted it in others, it was held to repeal the common law on the subject of innkeepers' lien.

Section 3241 and Section 3248 appeared in different acts of the Legislature, enacted at different times and later brought together in the revisions. It is argued by the respondent with plausibility, and his position supported by authority, that on account of the difference in origin and purpose of the acts, including them together in the same article and chapter of the Revised Statutes does not necessarily make them applicable to the same subject, and that the penalty provided in Section 3248 cannot be applied to the violation of Section 3241. [Paddock v. Mo. Pac. Ry. Co., 155 Mo. 524, l. c. 535-6; Miller

v. Boulware, 267 Mo. 487; Strottman v. Railroad, 211 Mo. 227, l. c. 256-257.]

However, it is not necessary to apply the principle announced in these decisions to the question under consideration. For the purpose of this argument, but without deciding such to be the case, it may be conceded that Section 3248 is applicable to a violation of Section 3241. The appellant argues that the statutes cover the entire subject-matter under consideration and so repeal the common law upon the subject; therefore, the only remedy which the plaintiff had in this case was an action for the penalty provided by Section 3248. In the Iba case, 45 Mo. l. c. 474, the ruling in which has been approved by later decisions (Chandler v. Railroad, 251 Mo. l. c. 600), this court had under consideration the statute requiring railroads to fence their track at certain points. It was held that since an action would lie at common law for the negligent killing of stock which got upon the railroad company's track, the statute, by merely providing an additional remedy, was not exclusive, and the common-law remedy still remained. Appellant asserts that ruling is not in point because the entire subject is not covered in the fencing statute, that there are various circumstances under which the stock might be killed so as to render the railroad company liable where the statute affords no remedy, and the only remedy would be at common law. By the same token we may say the entire subject is not covered in the case of freights by Section 3241 and other sections relating to maximum freight-charges. It is entirely conceivable that a railroad company of the class under consideration might charge the maximum freight rate provided in Section 3241, and the circumstances might be such that the maximum charge would be excessive. Such a situation is both theoretically and practically possible. In that case the only remedy of the shipper would be an action at common law for overcharges. A significant statement in the Iba case, 45 Mo. l. c. 474, is this:

"The statute under consideration imposes the obligation to fence. It dispenses with any other proof of negligence if the fence is not built, and it compensates the sufferer with double the loss. If nothing were said about damages, the defendant would be liable for the actual loss; so, I imagine, he would be liable if nothing more were said about the evidence. The obligation of itself creates the liability."

In this case the statute, Section 3241, provides a maximum freight rate and a charge in excess of that maximum is excessive. The statute dispenses with proof that the charge is excessive, just as the fencing statute dispenses with the proof of negligence. If there were no penalty provided anywhere the shipper could recover for overcharges, just as in the cattle case they could recover for the actual damages inflicted; the case would turn upon a matter of evidence.

Further light is thrown upon the matter by the conclusion announced in the case of White v. Delano, 270 Mo. 16. That was a suit brought to recover the penalty provided by Section 3248, thrice the charges for freight in excess of the rates provided by section 3241. The court held that by the injunction proceeding in the Federal court, to which the defendant railroad company was a party, the same injunction proceeding mentioned in the pleadings in the present case, the penalty section, 3248, was suspended from the time the act was held unconstitutional in the Federal Circuit Court until the decision was reversed by the United States Supreme Court, and the penalty could not afterwards be imposed for any violation of the rate statute during that period.

The court held further that the rate section (3241) was not suspended during the period; so by the reversal by the United States Supreme Court the penalty section was not restored to life so as to take effect during the period the injunction held, but the rate section was revived so as to take effect during that period, and the

plaintiff was allowed to recover the actual overcharge. The case separated the rate section from the penalty section, and allowed a recovery for violation of the former when the latter was not enforcible.

We hold the penalty is not an exclusive remedy, plaintiff's action is at common law, and the five-year Statute of Limitations applies.

III. We come now to inquire whether the rate provided for in Section 3241, Revised Statutes 1909, is confiscatory when applied to the shipment of the ties of Hackworth over the defendant's road. Certain principles have been laid down in rate cases before the Supreme Court of the United States to be applied in determining whether a rate is confiscatory and unconstitutional.

The shipments must be considered with all the traffic on the particular road whose rate is attacked. Account must be taken not only of the actual expense in carrying the particular commodity under consideration, but all other expenses, outlays, etc., such as maintenance, replacement, general expense, taxes, etc. All this must be properly apportioned with other intrastate traffic, and in turn the intrastate traffic must be properly apportioned with the interstate traffic. The general expense mentioned must be apportioned, even though it would have been incurred to the same extent if the freight under consideration had not been shipped at all. After these expenses are ascertained and deducted from the receipts at the prescribed rate, there must be sufficient balance to offer a reasonable return upon the value of the plant.

These general principles were applied by the trial court in the determination of this case, as shown by the declarations of law asked by the defendant and given. They covered every contingency in such apportionment which could be thought of, and gave the defendant even more than it was entitled to. There is necessarily a wide discretion in the application of these rules. For

instance, it is held not to be necessary that all commodities should be treated as carried at the same rate of expense. [Nor. Pac. Ry. Co. v. No. Dakota, 236 U. S. 597.] The Legislature is not bound to fix uniform rates for all commodities, nor to require that the same percentage be made on all sorts of business. [Id. l. c. 598-9.]

Another principle must be kept in mind. Rate making is purely a legislative function, and may be exercised by the Legislature directly or by some subordinate administrative body, or "administrative arm of the Legislature," such as the Public Service Commission. [Knoxville v. Water Co., 212 U. S. l. c. 8; State v. Mo. Southern Ry. Co., 214 S. W. 381; L. & N. Ry. Co. v. Garrett, 231 U. S. l. c. 305.]

In the case last cited it was said, at page 313:

"The rate-making power necessarily implies a range of legislative discretion; and so long as the legislative action is within its proper sphere, the courts are not entitled to interpose and upon their own investigation of traffic conditions and transportation problems to substitute their judgment with respect to the reasonableness of rates for that of the Legislature or of the Railroad Commission exercising its delegated power."

Whether a rate fixed by the Legislature is confiscatory is a question of fact, and the facts which would invalidate the rate-fixing act must be clearly established. [Minn. Rate Cases, 230 U. S. 452-453; City of Knoxville v. Knoxville Water Co., 212 U. S. 18.]

The trial court found as a fact that the rates during the years under consideration were not confiscatory as applied to the shipments of the plaintiff's ties; unless the evidence clearly shows to the contrary that finding of the trial court must be sustained.

The most important element to consider in connection with rate fixing is the value of the property on which the carrier must have a reasonable return. The cost of reproduction is mentioned as proper to consider in ascertaining the present value of the plant. [Minn.

Rate Cases, 230 U. S. 452.] But this is subject to limitations. Property other than land will depreciate so as to be worth less than if reproduced new and that depreciation must be deducted. [L. c. 457.] In case of real estate, which forms a part of railroad property, increase in value may be considered, provided a speculative increment is not to be taken into consideration. [Minn. Rate Cases, 230 U. S. 1. c. 454.] The value must be no greater in the case of real estate than the value of similar lands.

In 1913 the defendant railroad company applied to the Missouri Public Service Commission for the purpose of procuring an order to increase the statutory rates on the ground that such rates were unreasonable and confiscatory. The Public Service Commission, after hearing the case on November 10, 1915, decided the matter and promulgated rates to be applied to all the intrastate shipments of the defendant company. The evidence, comprising several hundred pages, taken before the Commission, was introduced in this case and admitted without objection. Other evidence was also introduced upon the trial of this case, all of which has been considered by us. It shows such values *in the year 1914*, so that the Public Service Commission might fix rates for the future. The appellant asks this court to consider that evidence for the purpose of determining values and the returns on such values for the years 1909, 1910 and 1911. While the report of the Public Service Commission in that case was not introduced in evidence, it is constantly referred to by the appellant (3 P. S. C. Rep., p. 1), as if before the court, and therefore appellant cannot complain if we take in some matters the conclusions reached by the Public Service Commission, instead of examining the details of figures and calculations from which the body drew its conclusions.

There was a conflict in the evidence between the chief engineer of the defendant company, Mr. H. H. Woodman, and that of W. K. Sparrow, representing the

Public Service Commission, in the inventory and appraisement of the property. There was also a conflict in the evidence between Mr. McShane, chief accountant of the Public Service Commission, and Mr. Fremon for the defendant company, as to the proper division and apportionment of operating expenses for the year 1914.

In estimating the values the Public Service Commission ascertained the cost of defendant's property as shown by the books of the company, and by the Commission's accountant. The estimates of this book-cost commences with July 1, 1891, and shows the investment in "road equipment and supplies" up to June 30, 1914. It embraces all items of expenditure, including the right of way, station grounds, real estate, grading, bridges, trestles, etc. The Commission, after reviewing and analyzing the evidence, found the original cost of the defendant's plant, "together with additions and betterments, material and stores on hand," did not exceed a total investment of $740,000 at June 30, 1914. In determining the value at that date the Commission apparently took into consideration depreciation and appreciation. It was stated that there appeared no question that parts of the property had appreciated in value, such parts as land and solidification of the roadbed. The cost of grading the roadbed was shown by the evidence to be between $250,000 and $272,000. The land was valued at $38,000, showing the part of the property which had appreciated was very considerable. The Commission then, for the purpose of estimating the present value in 1914, found the property could be reproduced new for $894,500. It then determined the value to be fixed for the purpose of settling the rates June 30, 1914, at $823,000. Since that amount is largely in excess of the original cost, without analyzing the evidence, we conclude it must have been determined by the Commission that the appreciation of the property had been very considerable; more than the depreciation. It is the value thus fixed for 1914 which the appellant de-

sires this court to take into consideration. It suggests the only method of arriving at the value of the property during the years 1909-10-11 is to take account of additions to the plant, and deductions from it between those years and 1914. With additions the plant in 1914 was worth about $17,000 more than in 1909, and about $3,000 more than in 1910. These additions were right of way, station grounds, etc. In 1911 the plant is estimated to be $11,000 greater than in 1914, because a part of the railroad had been abandoned between those dates, so as to reduce the value that much. Thus it appears that the values which the appellant would have this court attach to the property in 1909-1910-1911 is substantially the same as the value which it claims the evidence shows and the Commission found was its value in 1914. The only variations suggested are those slight additions and subtractions to the plant.

The Commission in fixing the value employed as the most important element in its calculations the cost of reproduction new, and from this all calculations were drawn. This was reproduction in 1914, and followed closely estimates made by engineers for the Company and for the Commission. The value fixed was a compromise of those estimates. To arrive at the value of the plant in 1909, 1910 and 1911, there is no estimate as to the costs of reproduction new *then*. From those years until the estimate in 1914 the solidification of the road-bed and the real estate sensibly appreciated; how much is not shown. The cost of reproduction in 1909 probably would not have been anything like such cost in 1914—five years later when everything probably was higher. No figures are given as to the value of steel rails in 1909, yet steel rails constituted about one-fourth of the cost of reproduction in 1914. Since the original cost and all betterments was placed at $740,000, it is fair to say there had been great depreciation from 1891 down to that date. And there is no evidence to show whether the cost in 1909 would have been greater

or less than the original cost; whether the property was worth more in 1909 than the original cost less actual depreciation.  So, in estimating the value for the years under consideration the following elements, taken into consideration in fixing the value in 1914, are entirely lacking: the cost of reproduction new; the depreciation of property other than land; the cost of reproduction in its then condition; the appreciation from 1909-10-11 until 1914 of the land or property which appreciates.

In arriving at the net income for 1914 the Commission summarizes the evidence of McShane and Fremon and finds that the net income for 1914, while the statutory rate was applied, was $55,775 (3 P. S. C. Rep. l. c. 41); that was for the total business interstate and intrastate transacted by defendant company.  The net income was much greater for previous years.  The evidence of McShane is that the net income for 1909 was $22,516; for 1910, $83,579; for 1911, $72,855, when the charge was in excess of the statutory rate.  The Commission notes, as shown by the evidence, that there was a sudden increase of income for 1910, which prevailed during all the subsequent years.  The gross income, by the testimony of McShane, for 1910 was $174,648; for 1911, $171,177; for 1914, $174,069.  Thus the gross income, grand total revenue, was about the same in the years 1910 and 1911 as it was in 1914, while the total expense in 1914 is shown to be from fifteen to twenty per cent in excess of what it was in either of the three years under consideration.  Maintenance for the year 1914 was found by the Commission to be about $55,000, while in the year 1909 it was $34,000; 1910, $22,000; 1911, $20,000.

During the year 1914, it will be noted, the company operated at much greater expense than during the years under consideration.  If the company had operated in 1914 at the same expense, for instance, as in 1910, its earnings, instead of being $55,000, would have been about $75,000, a net return of more than ten per cent on what

was the probable value in 1914. This, of course, takes the total return and expense for operating the road on all classes of traffic. Mr. Fremon, the general auditor of the defendant company, produced evidence—and this was the only evidence offered upon the point—showing the apportionment of the revenue derived from and the expense assigned to each class of traffic; to the freight and passenger traffic, and to the interstate and the intrastate traffic. He shows the cost of the intrastate service to be more than seventy-six per cent of the total. He estimates the value of the property devoted to each class of service, and about the same per cent of property is assigned to intrastate use. The revenue from the interstate traffic appears by Fremon's calculation to have been, for the year 1914, almost forty per cent of the total. Taking these figures with the entire net return for 1914, making proper adjustment between the interstate and intrastate traffic, considering the elements lacking in a proper estimate of the values of property for the years under consideration, and the lessened expense of operation during those years, we cannot say that the trial court was in error when it found that the defendant company had failed to prove that the charges during those years were excessive and confiscatory.

If one apportions the expense of operation so as to make it in the same proportion as the income between interstate and intrastate traffic, and then makes allowance for the smaller expense for the years 1909, 1910 and 1911, as compared with 1914, it is easy to figure a fair rate of interest on the investment for those years, especially if the value for those years was appreciably less than in 1914.

From the record there are 127 counts of the petition barred by the five-year Statute of Limitations, but seven of these were dismissed, and respondent does not dispute the statement that the overcharges alleged in these counts occurred more than five years before the suit was filed.

The judgment is therefore reversed as to the 120 counts mentioned by number in the answer after the dismissal of the seven mentioned, and the judgment of the trial court is affirmed as to the other counts. *Mozley, C.,* concurs; *Railey, C.,* not sitting.