THE STATE ex rel. WASHINGTON UNIVERSITY v. PUBLIC SERVICE COMMISSION OF MISSOURI et al., Appellants.

In Banc, May 23, 1925.

1. **PUBLIC SERVICE: Contract Rates: Ineffectual.** The Public Service Commission, in fixing the rates of electricity to be charged private consumers by a public utility, cannot be clogged or obstructed by contract rates agreed upon when said utility took over the individual plants of such consumers. The Commission is not a court, and has no power either to construe or enforce contracts, neither can its acts in fixing rates be influenced by contracts existing between the utility and consumer.

 *Held,* by WALKER, J., dissenting, that the police power does not authorize the abrogation of rates fixed by a voluntary contract between the public service corporation and a private consumer unless it can be determined with reasonable certainty, by the use of every instrumentality at the command of the Public Service Commission, that the rate fixed by the contract injuriously affects the public welfare and is detrimental to the public interest; and where the Commission's expert appraisers have not appraised the properties of the public corporation, its

prayer for an increase of rates far above the contract rates "to meet the increased costs of fuel, taxes and wages" should not be granted.

2. ———: ———: Public Utility: Different Plants: Steam-Heating. The fact that the electrical corporation had one central plant, and various other smaller plants located at different parts of the city, in the neighborhood of consumers, from some of which certain consumers were supplied with electricity and steam heat, and from some of the others other consumers were supplied with electricity or steam heat or both, the various local plants being used in winter when steam-heating was necessary, and usually not used for the supply of electricity in summer, did not tend to prove that the corporation was not a public utility, and therefore contracts with such consumers have no bearing on the right of the Public Service Commission to fix rates.   [WALKER, J., dissenting.]

3. ———: Electricity and Steam Heat: Allocation of Rates: Applications. A corporation whose charter empowers it to manufacture and furnish heat and power to the public—heat by electricity, heat by steam, as well as electric light and electric power—may make separate applications to the Public Service Commission for an increase of rates, based upon increased labor and fuel costs, but whether the application is made separately for an increase in the rates for steam heat or for heat by electricity and for electric power and light, or is general, and made for an increase of all rates, the instrumentalities used in producing steam must be so allocated that its production must bear its proportionate expense of operating the plant, and receive its fair proportion of the profits, in order that there may be a reasonable return upon the whole investment for public use.

Held, by WALKER, J., dissenting, that the public electrical corporation in this case, in the matter of furnishing steam heat, was performing a private and not a public service; it did not do a general heating business; it picked one building here and another there, and discriminated among buildings by separate bargaining, and where it failed to make a contract that would yield a profit it refused steam-heating service to such buildings; and therefore the Public Service Commission had no jurisdiction to put into effect any schedule of rates for steam-heating service, and such rates cannot be allocated with the public service electric rates.

4. ———: Purpose of Public Commission Act: Fair Return. The purpose of the Public Service Act is to require the general public to pay such rates as will keep public utility plants in proper repair for effective public service and insure the investors a reasonable

return upon the funds invested. The police power demands such even-handed justice, and the Public Service Commission is required to fix rates that are at the same time fair both to the public and the investors.

5. ———: Rates: Impairment of Private Contracts: Police Power. The constitutional provision (Sec. 5, art. 12) that "the exercise of the police power of the State shall never be abridged" prevents the abdication or bargaining away of the State's power to fix rates for electricity, steam and other public service furnished by a public utility to private citizens, and makes wholly inapplicable a private contract relating to such rates. Such rates are not private contract rights, and no contract agreement upon rates is of any force or effect in arriving at a fair rate or the reasonableness of a rate fixed by the Public Service Commission.

Held, by WALKER, J., dissenting, that where the public service corporation and a private consumer voluntarily entered into a contract fixing the rates to be paid by the consumer for the service rendered by the corporation, the corporation must furnish the service at the stipulated price, unless the State itself revokes the contract on the ground that its rates result in confiscating the corporation's property and are clearly detrimental to the public welfare; and the State cannot, under its police power, increase the rates fixed by the contract solely in order that the corporation may have a reasonable income from its investment and pay dividends to its stockholders, but it must be made to appear that the corporation cannot continue to function unless the contract rates are increased; and its public circular announcements of a steady and healthy improvement in its financial affairs show that no emergency exists, and therefore such agreed contract rates cannot be abrogated.

6. ———: Experimental Rates: Reasonableness. Courts will be slow to interfere with experimental rates fixed by the Public Service Commission; they will interfere only when its order is unreasonable; and it cannot be held that the Commission, after full investigation as to increased cost of production, acted unreasonably in making a trial order, by the terms of which the rates by it fixed were to remain in force for one year, during which time further data would be kept and gathered for its information, and if at the end of the year the test rates appeared to be unfair they would be changed.

Held, by WALKER, J., dissenting, that the facts show that the test rates fixed upon are discriminatory in favor of the city, which is receiving service at less rates than other consumers, and the rates are therefore void under the statute (Sec. 10477, R. S. 1919).

State ex rel. Washington University v. Publ. Serv. Comm.

Citations to Headnotes: Headnote 1: Electricity, 20 C. J. sec. 26. Headnote 2: Electricity, 20 C. J. sec. 26 (Anno); Steam, 36 Cyc. p. 1261 (Anno). Headnote 3: Electricity, 20 C. J. secs. 26 (Anno), 29; Steam, 36 Cyc. p. 1261 (Anno). Headnote 4: Electricity, 20 C. J. sec. 26; Steam, 36 Cyc. p. 1261 (Anno). Headnote 5: Electricity, 20 C. J. secs. 26, 29; Steam, 36 Cyc. p. 1261 (Anno). Headnote 6: Electricity, 20 C. J. sec. 26. (Anno); Steam, 36 Cyc. p. 1261 (Anno).

Appeal from Cole Circuit Court.—*Hon. John G. Slate,* Judge.

REVERSED.

*R. Perry Spencer* and *Jourdan, Rassieur & Pierce* for appellants.

The only questions properly reviewable in this case are (a) whether the Commission had jurisdiction to inquire into the public character of the company's business, electric and steam heating, (b) whether the company is or is not a public utility in such businesses, (c) whether the evidence justified the Commission in permitting an increase in the company's rates, and (d) whether the rates allowed are reasonable and not discriminatory. (1)    The Commission has power to establish maximum rates for the public utility business defined in the Public Service Act, but the Commission has no power to pass on the effect of such rates upon particular contracts, nor to include or exempt particular contracts from such rates, nor to determine whether the company in entering into particular contracts acted in a private capacity if the subject matter of the contract comes within the act— nor did the Commission undertake to do so in this case. These are judicial questions. The Commission is not a part of the judicial system authorized by the Constitution. It is an administrative agency of the law-making power. Hence, the circuit court had no power to determine such questions in *certiorari* proceedings, and no such questions should be considered on this appeal. Lusk v. Atkinson, 268 Mo. 109; Mo. Valley Realty Co. v. Cupples Sta. L. H. & P. Co. 199 S. W. (Mo.) 151; Atchison T. & St. F. Ry. Co. v. Pub. Serv. Comm., 192 S. W. (Mo.) 460; In re York Water Co., 1918E, P. U. R. 356; United Coml. Travelers v. Livery Co., 1918E, P. U. R. 391, 395;

In re Independent Sewer Pipe Co., 248 Fed. 547; Ex parte City of Birmingham, 74 So. (Ala.) 51; People ex rel. v. Straus, 174 N. Y. Supp. 868. (2) The order of the Commission is a general order fixing rates for electric service and for steam service. It is applicable to all customers, but does not attempt to adjudicate any rights which relators may have to dispute such rates if in conflict with their contracts. (3) If relators have contracts entitling them to rates which cannot be changed by subsequent state regulation, then relators have an adequate remedy. If sued by the company for the increased rates they can plead their contracts and defend at law, or, they may pay under protest, according to the new rates, and recover back the excess by action at law; if the company threatens to discontinue the service because of their failure to pay the increased rates, relators have an adequate remedy in equity for specific performance or by injunction. (4) Under the evidence in this case it is clear that the company is a public utility corporation as to steam heating as well as electric service. (5) The Public Service Act expressly subjects the business of electrical corporations and of steam heating corporations to state regulation, and empowers the Commission to determine and prescribe just and reasonable rates. (6) The question whether there is a public use cannot depend on whether or not the company has a franchise; the validity of the franchise must depend on the question whether there is a public use. It must first be decided whether there is a public use—if there is then it is subject to state regulation, whether there is a franchise or not. (7) The fact that there is no general ordinance in the city of St. Louis creating steam heating franchises is immaterial. Permits granted by the city to the company authorizing it to use the streets for such purpose and such actual use by the company, tend as strongly to show that the company is in fact engaged in furnishing steam heat as a public utility, as if it were operating under a general ordinance. Insurance Co. v. Lewis, 233 U. S. 389, 406; Munn v. Illinois, 94 U. S. 113, 125. (8) The Legislature has seen fit to regard

public heating service as a service "affected with a public interest" and has placed it under the jurisdiction, control and regulation of the Commission. The Legislature had power to do so. Munn v. Illinois, 94 U. S. 113, 125; Insurance Co. v. Lewis, 233 U. S. 389, 406; State ex rel. Subway Co. v. St. Louis, 145 Mo. 551. (9) Rates fixed in contracts with public service corporations must give way to rates subsequently fixed by the Commission, which is charged with the duty of fixing just and reasonable rates. This is true whether the rates fixed by the Commission be increased or decreased, and whether the contract was made before or after the passage of the law creating the Commission. K. C. Bolt & Nut Co. v. L. C. L. & P. Co., 275 Mo. 529; State ex rel. City of Sedalia v. Pub. Serv. Comm., 275 Mo. 201; City of Fulton v. Pub. Serv. Comm., 275 Mo. 67; City of St. Louis v. Public Service Commission, 276 Mo. 528; Kansas City v. Public Service Comm., 276 Mo. 548; Union Dry Goods Co. v. Georgia P. S. C., 248 U. S. 372; Raymond Lbr. Co. v. Raymond L. & W. Co., P. U. R. 1916F, 441; Adams v. Dakota Central Telephone Co., P. U. R. 1916F, p. 579; Pinney & Boyle Co. v. Los Angeles G. & E. Co. L. R. A. (N. S.) 1915C, p. 282, and note. (10) The evidence shows that an urgent emergency existed, due to increased costs of coal and labor and taxes, which compelled the company to ask for relief, if it expected to be able to continue in business and serve the public. But whether an emergency then existed or not is really immaterial. The Commission, upon the evidence before it, had the power to establish the rates, and the only question which can now be raised is whether the rates as fixed are reasonable and not discriminatory. (11) The Commission did not err because it failed to declare that such of the relators as were the owners of isolated plants where the function of generating both heat and electricity was combined (Washington University, Income Leasehold Company, St. Louis Brewing Association, Wainwright Real Estate Company, National Bank of Commerce, Stix, Baer & Fuller Dry Goods Company and Ely & Walker Dry Goods Company) belonged

to a separate class, and were entitled to lower rates than other customers. Such customers had leased their plants to the company and the company was operating them as a public utility, selling service to them and, in some instances, to other customers from such plants, and therefore the relators, the lessors of such plants, were in the same class with other customers getting similar services from the company. (12) If the Commission had not increased the rates of isolated plant customers, the Commission would have been forced to place the whole burden upon the remaining customers of the company, in order to permit the company to earn a reasonable return on its investment, and such a classification of rates, exempting isolated plant customers, would have been discriminatory. Tap Line Cases, 234 U. S. 1.

*Bryan, Williams & Cave* for respondents.

(1) The Commission undertook, by its order, to change rates and charges in the private contracts for private service to the Pierce Building and other buildings. This court has held that the question whether public rates fixed by the Commission will supersede rates fixed by private contract, should properly be raised in the proceeding by *certiorari* to review the ruling of the Commission. K. C. Bolt & Nut Co. v. Light & Power Co., 275 Mo. 529; State ex rel. City of Sedalia v. Pub. Serv. Com., 275 Mo. 201. (2) While the Electric Company was a public service corporation in some respects, this fact is in no way inconsistent with the fact that that part of its business which consisted in operation of private isolated plants of private individuals for such individuals was a private business, and not subject to the jurisdiction of the Commission. Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238; Terminal Taxicab Co. v. District of Columbia, 241 U. S. 252; Manufacturers Ry. v. United States, 246 U. S. 494; Notawa Gas Co. v. Henry Oil Co., 269 Fed. 742. (a) The Public Service Act expressly recognizes the fact that an electrical corporation may be engaged in carrying on "other business

than owning, operating or managing" an electric plant, and expressly provides that with respect to such other business said corporation shall not be subject to the provisions of the act. R. S. 1919, sec. 10478, subdv. 13. (b) The question as to whether a particular kind of business done by a public utility corporation is a public service or a private business is to be determined, not by the charter powers of the company, but by the nature of the particular business in question. United States v. Brooklyn Terminal, 249 U. S. 304; Terminal Taxicab Co. v. District of Columbia, 241 U. S. 252; Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238. (c) The State cannot by mere legislative *fiat* or by any regulating order of a Commission convert into a public utility a work which is in its nature a private business. Producers Transportation Co. v. Railroad Comm., 251 U. S. 228. (3) The operation by the Electric Company of the private plant of the Pierce Building for the use of the Pierce Building under a private contract with the Pierce Building was not a public service. Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238; Terminal Taxicab Co. v. District of Columbia, 241 U. S. 252; State ex rel. Danciger v. Pub. Serv. Comm., 275 Mo. 483; Cawker v. Meyer, 147 Wis. 320; Public Utilities Com. v. Telephone Assn., 270 Ill. 183; State ex rel. v. Spokane Co., P. U. R. 1916D, p. 469; Wyman on Public Service Corporations, sec. 115; Allen v. Railroad Comm., 179 Cal. 68; Notawa Gas Co. v. Henry Oil Co., 269 Fed. 742. (a) The Electric Company had no schedule for public heating. (b) The Pierce Building could not have obtained an order from the Commission to compel the Electric Company to operate the Pierce Building plant. State ex rel. Danciger v. Pub. Serv. Comm., 275 Mo. 483. (c) The Electric Company had no franchise to transmit heat along or across the streets of St. Louis. (4) Even if the service under the contract with the Pierce Building were considered a public service, still, such contract would not be abrogated, except by the exercise of

the police power of the State. State ex rel. v. Pub. Serv. Comm., 275 Mo. 201. (5) The limit to the exercise of the police power is this: The rulings of the Commission must have reference to the health, comfort, safety or welfare of society or the public generally. The selfish interest of one party to a contract cannot justify the exercise of the police power of the State to nullify it. Ohio & Colorado Smelting & Refining Co. v. Public Utilities Com., 187 Pac. 1082; Public Utilities Com. v. Wichita R. & L. Co., 268 Fed. 45; In re Stockton Springs Water Co., P. U. R. 1920E, p. 918; In re Rockingham County L. & P. Co., P. U. R. 1917F, p. 26. (a) There was no finding by the Commission anywhere that the increase in rates was necessary to enable the company to perform its public duties, nor was there a finding anywhere that the welfare of the public was in any way involved in this case. (b) It was error for the Commission to undertake to shift the heavy burdens of the war period from public utilities to their patrons. Re Home Telephone Co., P. U. R. 1919A, p. 250; Re Hydro E. L. & P. Co., P. U. R. 1918A, p. 325; Re S. W. Gas Co., P. U. R. 1918B, p. 82; Re Tri-State Tel. & Tel. Co., 1919C, p. 5. (6) Statements of the financial condition of the company made by the company itself while this suit was pending, show that the company was in a prosperous condition. Its ability to serve the public was not in any way impaired, and it was not in any way necessary to the welfare of the public that the contract with the Pierce Building, or other similar contracts, should be abrogated. (7) If there was to be any increase at all in rates, the failure to include municipalities, and persons holding contracts for hydro-electric current, among the persons to be affected by the increase, was unjust discrimination. Milwaukee E. R. & L. Co., P. U. R. 1919A, p. 136; State v. M. K. & T. Ry. Co., 262 Mo. 507; Simms v. Columbia Tel. Co., P. U. R. 1915C, p. 366; Hollister v. Hollister Water Co., P. U. R. 1915D, p. 626; In re Augusta Water Dist., P. U. R. 1916E, p. 31; In re Atlantic County Electric Co., P. U. R. 1918B, p. 589.

*Charles M. Polk* also for respondents.

(1)   A valuation of the physical property of a utility company is ordinarily required before rates are fixed. The only condition that would justify making a rate without a valuation would be that an emergency existed which threatened the ability of the utility to continue to operate.  The burden of proving that such an emergency exists is upon the utility.  The evidence in this case shows that there was no emergency, either in 1917, when the petitions for increases were granted, or in 1918, when the increases were granted.  The increases granted were unreasonable and put the entire increased expense of the Electric Company on its consumers instead of requiring it to bear at least a part of the burden.  (a) There was no emergency as emergency is defined in the following cases:  Public Service Co., P. U. R. 1918E, p. 915; Lincoln Traction Co., P. U. R. 1918D, p. 168; In re Tutwiler, P. U. R. 1919E, p. 320.  (b)  The burden of proof was on the Electric Company to show that an emergency existed.   Ohio & C. S. Co., 187 Pac. 1086; Re Idaho Public U. Com., P. U. R. 1918B, p. 56; In re Queensborough G. & E. Co., P. U. R. 1918F, p. 983; Re Public Service Co., P. U. R. 1918D, p. 240; Home Telephone Co., P. U. R. 1918C, p. 495; Arizona G. & E. Co., P. U. R. 1918F, p. 733.  (c)  The facts in evidence show that there was no emergency in 1917.   (d)  The earnings for 1918 were in excess of 1917.  (e)  The Ruffner or Compensatory Method, advocated by the Electric Company to ascertain the increase that should be granted, and the argument that the Electric Company should have the same rate of return as prior to the war, are wrong in principle.  The company must bear at least a share of the burden.  The police power is exercised not for the purpose of allowing the utility to maintain its dividends, but in order that its contract rates may be raised so as to allow it a sufficient revenue to continue to operate, this being for the public good and not meant for the benefit of the stockholders of a utility.   In re

Queensborough G. & E. Co., P. U. R. 1918F, p. 872; In re Hydro E. L. & P. Co., P. U. R. 1918A, p. 341; Re S. W. Gas. Co., P. U. R. 1918B, p. 85; Re Tri-State L. Co., 1919C, p. 7; Re Northern California Co., 1918C, p. 397; Re N. Y. Tel. Co., 1918D, p. 29; Re Salt Lake U. R. Co., 1919C, p. 571; In re Louisiana Water Co., P. U. R. 1918B, p. 778; Ohio & C. S. Co., 187 Pac. 1086; Monigault v. Springs, 199 U. S. 480. (f) The Whitlow or "Adjusted Cost" Theory of ascertaining expenses was entirely artificial and gave a wrong mathematical result. Its use by the Commission resulted in the ascertainment of expense that was incorrect and an allowance therefor that was mathematically wrong. (g) The Allison Method of ascertaining the expense, based on the actual cost, should have been adopted. (h) The rates allowed by the Commission gave the company an excessive earning. (i) The steam losses which the company alleged it was suffering were ascertained by an improper allocation of costs as between the steam and coal departments. This method of allocation was criticized by the Commission at one time, but apparently adopted when it awarded the Electric Company its increases. (2) The earnings of the Electric Company for past years have been excessive. Therefore, it should not have been allowed any increase. Re Queensborough G. & E. Co., P. U. R. 1918F, p. 879; Home Tel. Co., P. U. R. 1919A, p. 250; Lincoln Traction Co., P. U. R. 1918D, p. 174. (3) The company asked and the Commissioner put into effect schedules which were discriminatory as between its various classes of customers. (4) In furnishing steam service the Electric Company was performing a purely private service. The Public Service Commission, therefore, had no jurisdiction to put into effect any rate schedule concerning such steam service. Terminal Taxicab Co. v. Public Util. Com., 241 U. S. 252; State ex rel. Danciger v. Public Serv. Com., 275 Mo. 483; State ex rel. United Railways Co. v. Public Serv. Com., 270 Mo. 429. (5) The lack of jurisdiction of the Public Service Commission to establish steam rate schedules

for the Electric Company in the city of St. Louis may properly be considered in this proceeding.

GRAVES, C. J.—This is not the first opinion in this case, and such fact bespeaks a concise, yet a considerate statement of the case. Volume adds nothing to a statement. What is said in briefs, and in statements, can be stated shortly, for the purpose of passing upon the vital questions. There are eighteen cases before us, all growing out of two cases filed before the Public Service Commission. The two cases, out of which all the present cases grow, were two applications to the Public Service Commission, which applications were made by the Union Electric Light & Power Company, for temporary increased rates both on electricity and power, and upon heating. These applications were filed about November 28, 1917, and the applications were heard, and investigated, and by the Commission determined in February, 1920. Before the Public Service Commission the case as to heating was number 1395 and that as to electricity was numbered 1396. The Public Service Commission raised rates as to both services, upon proven facts as to the respective costs of operation. These increases were to be for a limited time, and the Commission by requisite orders placed itself in position to determine from future reports of the utility as to how long the rates should be retained. There were a number of consumers (of both heat and electricity) who opposed any change of rates, as are usual in such cases. This case is out of the ordinary, however, because in many instances these particular consumers had been operating their own plants, within their own buildings, from which they got a part, if not all of their heat, and electrical current and power. These plants were leased to the Union Electric Light & Power Company, which leases (as is claimed) fixed the price of service to these special consumers. Other customers, who likewise turned over their plants, have not complained. The details of these will be left to the opinion, if they become material. The applica-

tions for these increases in rates brought a storm of protests from eighteen consumers of heat and electrical current and power furnished them by the Union Electric Light & Power Company, and they intervened in the two cases. Their charges ran the gamut from the alleged fact the Union Electric Light & Power Company was not a public service corporation as to furnishing heat, and clear down the line. One principal contention is that these special consumers have term contracts (as to rates) under these leases, and that such rates cannot be increased during these contract terms. The front door question is that the Union Electric Light & Power Company (as to heating) is not a public service corporation at all, and hence an absence of jurisdiction in the Public Service Commission to deal with that question. Beaten before the Public Service Commission these intervening consumers sued out statutory *certiorari* to the Circuit Court of Cole County, where upon a hearing the orders of the Public Service Commission were set aside.

From that judgment the Public Service Commission and the Union Electric Light & Power Company have appealed. The individual complaints of the several eighteen consumers have been separately preserved, so that if one (in matters of its individual rights) has advantage over the other, they are preserved in the eighteen cases here. The broad questions are common to all cases.

I. What we have denominated the ''front door'' question, in this case relates to the heating activities of the Union Electric Light & Power Company. The Public Service Commission (much better equipped than is this or any other court) to find and determine facts, has this to say upon this branch of the case:

''The appellant company has established a large downtown heating plant in the vicinity of Tenth and St. Charles streets, and has installed steam pipes connecting it with a number of large adjacent buildings, and has contracted to furnish steam heat to those building

from this plant when needed and to furnish electricity from its large central station. In addition the company has made contracts for steam heating with a number of consumers so situated that they could not be reached from the St. Charles heating plant. In accordance with these contracts the company has taken over the private plants of a number of consumers, agreeing to furnish the consumer steam for heating or other purposes, and with electricity for light and power. Usually the right is reserved in these contracts whereby the applicant may shut down the private plant entirely and supply both heat and electricity from some outside source. The company has managed the detail of supplying such service in each case in whatever manner appeared to it to be the most economical. In the summer when there was little or no heating demanded the company has followed the policy of shutting down most, if not all, of these isolated plants, and furnishing electricity from its own more efficient central plant. During the heating season it has operated some of the consumers' heating plants, furnishing heat to such consumers and sometimes connecting to adjacent consumers, and supplying them with heat from the same plant or plants. During this period of heating demand the company has apparently considered it economical to operate the consumers' electrical generating equipment, using the exhaust steam therefrom for heating. Usually the contract provided for steam heat for a definite space and for certain stipulated amounts of electricity, all for some fixed annual payment, with additional charges for electricity for any excess used above the amount called for in the contract. These contracts have carried with them temporary possession and use of the machinery, with provisions as to extensions or repairs and conditions pertaining to their return to the consumer when the contract has expired. A number of such proposals have been accepted, and the company has taken over some forty-odd such plants, some of which are entirely closed down, but a number of which are operated during the heating season, as above described.''

The foregoing findings of facts is of material moment here. They cover much more than the eighteen cases involved. This finding of the facts is well buttressed by the proof. Included in that proof are the contracts pleaded by interveners. These contracts are of no vitality, in so far as they affect rates. The Public Service Commission, in fixing rates, cannot be clogged or obstructed by contract rates. This question was early threshed out by this court in several cases, some of which went to the Federal Supreme Court, in each of which this court was sustained. The original case, the ruling in which has never been changed, is State ex rel. City of Sedalia v. Public Service Commission, 275 Mo. 201. The effect of this and subsequent holdings, is that contract prices count for naught in the fixing of rates by the Public Service Commission. The Public Service Commission is not a court, and cannot be influenced in any regard by the contract prices as to rates. As said such body is not a court, and has neither the power to construe contracts, nor to enforce them. If the contracts have any effect at all (as we think they have not) the only effect would be upon the question of whether or not the Union Electric Light & Power Company was a public utility, in so far as heating is concerned. We doubt their efficacy in that regard. This because such question depends largely upon charter powers, and what has been done under the charter powers. But of this question later. Certain it is that such contracts cannot influence service rates. All of these contracts (and there were many not involved in these eighteen suits) indicated a general purpose upon the part of the Union Electric to extend the steam heating branch of their business.

II. If these contracts have any bearing whatever in these cases, it must be on the theory that they tend to prove that the appellant was not in fact a public utility in this regard. Fortunately for the brevity of this opin-

ion, we have had before us the question of steam

**Private Utility.** heating. [State ex rel. Case v. Public Service Commission, 298 Mo. 303.] It does not show clearly in that opinion, but it was a fact in the case that the public utility had several different plants from which steam heat was furnished and generated. It appeared there, as it appears here, that there is too much waste in conducting steam heat for any great distance. In fact the only economical way of engaging in such a public utility is to have different plants, located in districts wherein there would be demand for the commodity, and that seems to be the plan of the claimant in these cases. Another question settled in the case, supra, is that where there is a combined plant for the production of both electricity and steam heat, there should be a proper allocation of the value of the plant as to the separate uses. In the cases before us we have instances where more electricity is produced than is required for the local plant, but such is saved for the company's reserve for general use. In other cases there is not a sufficient quantity, and the deficiency is made up from the general reserve in the main plant, or some of the minor plants. So too, if there was surplus steam in a given building, it would be piped out to fill another contract. So when the very nature of the business is considered, a multiplicity of smaller plants is required to save waste, and in order to economize in the business. The divers contracts suffice to show nothing in these cases. As a public utility the corporation cannot engage in private contracts, and the contracts before us do not show that the corporation intended to so engage. Steam heating comes under the Public Service Commission Act under our rulings, and the only real question in this case is the propriety of the temporary rates fixed. The rates fixed were for a test of a year, and then a time in addition given to get in reports, and from them determine the fair rates.

III. It is not disputed that the Union Electric Light & Power Company had the charter power to manufac-

ture and furnish heat and power to the general public. Not only heat by electricity, but heat by steam. Its charter seems to have been so drawn as to enable it to make use of all elements. It chose to engage (under its charter) in furnishing steam heat and power as well as electric lights, electric heat and electric power. It was so engaged when the applications for increased rates were made, which applications were based upon increased labor and fuel costs. There were separate applications, and for this there is ample authority. [Hackworth v. Missouri Southern Railroad Co., 286 Mo. 282.] In the last named case it was made to appear that the railroad was hauling railroad ties at an actual loss, although its whole business might not show the company to be in the red. We ruled, and rightfully so, that other customers of the railroad should not be compelled (by increased rates on their shipments) to make up the deficits from hauling ties. What is true in a case like that, is also true in a case like this. The Case case, supra, is practically on all-fours with the Hackworth case. In that we required a proper allocation of the instrumentalities used in the production of steam, so that it might be made to not only bear its proportionate part of the expenses, but likewise its proportionate part of the profits, to insure a reasonable return upon the whole investment for public use. The enactment of the Public Service Act marked a new era in the history of public utilities. Its purpose is to require the general public not only to pay rates which will keep public utility plants in proper repair for effective public service, but further to insure to the investors a reasonable return upon funds invested. The police power of the State demands as much. We can never have efficient service unless there is a reasonable guaranty of fair returns for capital invested. The woof and warp of our Public Service Commission Act bespeaks these terms. The law would be a dead letter without them, and a commission under the law, that would not read the law in the proper spirit, would be breathing in-

*Allocation of Rates.*

to it the flames of ultimate deterioration of public utilities. These instrumentalities are a part of the very life blood of the State, and of its people, and a fair administration of the act is mandatory. When we say fair, we mean fair to the public, and fair to the investors. This answers some suggestions in the briefs.

IV. Learned counsel for respondents have in view the force and effect of a contract under the views expressed in the Old Dartmouth College case. They overlooked the changes in the law made by constitutional provisions since that date. We have always been a strict constructionist, but in State ex rel. City of Sedalia v. Public Service Commission, 275 Mo. 210, we had occasion to review the law as it is now. Under our Constitution the police power of the State is held inviolable. [Sec. 5, Art. XII, Mo. Const.] In State ex rel. v. Public Service Commission, 275 Mo. 1. c. 209, we said.

Impairment of Private Contracts.

"Note the language, 'the exercise of the police power of the State shall never be abridged.' Under such a constitutional restriction the Legislature would be powerless to enact a valid law by the terms of which the right of the State in the exercise of its sovereign police power in the fixing of reasonable rates for public services could be limited or abridged. This court so held in Tranbarger v. Railroad, 250 Mo. 1. c. 55, whereat Bond, J., said:

" ' (2) All powers of government which regulate the public health, welfare and the property rights of its people—these, no State can strip herself of, for that would render it incapable of carrying out the prime purpose of its creation. The sanctity and import of this attribute of sovereignty are recognized in the Constitution of this State, to-wit: "The exercise of the police power of the State shall never be abridged, or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well-being of the State." [Art.

12, Sec. 5, Constitution of Missouri.] The only restrictions upon the exercise of this faculty are that its use shall be reasonably adapted to the ends for which it is given, and that it shall not infringe any right or privilege ,guaranteed by the Federal Constitution. The ,authorities and cases demonstrating these principles are uniform.'

"Some of us thought the pronouncement a little broad and dissented, but the case was taken to the United States Supreme Court and there affirmed. [Chicago & Alton Railroad Co. v. Tranbarger, 238 U. S. 67.]

"The United States Supreme Court was even more explicit in this Tranbarger case than was the majority opinion in this court. To its rule we must bow. At page 76 of this Tranbarger case, 238 U. S. 67, it is said:

" 'It is established by repeated decisions of this court that neither of these provisions of the Federal Constitution has the effect of overriding the power of the State to establish all regulations reasonably necessary to secure the health, safety, or general welfare of the community; that this power can neither be abdicated or bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. [Atlantic Coast Line v. Goldsboro, 232 U. S. 548, 558, and cases cited.] And it is also settled that the police power embraces regulations designed to promote the public convenience or the general welfare and prosperity as well as those in the interest of the public health, morals or safety. [Lake Shore & Mich. Southern Ry. Co. v. Ohio, 173 U. S. 285, 292; C. B. & Q. Ry. Co. v. Drainage Commissioners, 200 U. S. 561, 592; Bacon v. Walker, 204 U. S. 311, 317.]' "

The fixing of a rate for a public commodity, as we have here, falls under the police power of the State. From the beginning we have so ruled. This constitutional provision disrobes the contention of interveners as to private contract rights. They are not private contract rights, and when so viewed, there is no substance to these sundry contracts. The reasonableness of the rates fixed will call for another paragraph.

V.   Details will serve no useful purpose.   The Public Service Commission first determined that the Union Electric Power & Light Company was a public utility, both for electric power and current, and for steam heat.   Having determined that it was a public utility for all purposes, supra, the only matter left was to fix reasonable rates. These it determined to do by a series of investigations, all mentioned within the record.   After a full investigation as to the increased cost of its products, the Commission entered a trial order or judgment.   By the terms of this the matters were to be tested for a year, and the data kept and gathered for its information.   The rates were not permanent, but rates based upon the best information then before the Commission.   If, at the end of the year, the experiment showed a wrong conclusion, it could be set aside, and new rates fixed.   We are dealing solely with these experimental rates.   Not only so, but with experimental rates as to steam heat.   This court will be slow to interfere with the Public Service Commission, when they order an experiment to be made in order that equitable rates may be determined.   Our province is to determine whether or not the order made is unreasonable.   Of course the right to make the order is of first consequence, but this right clearly appears. It does not appear that the order was unreasonable. Without such a showing, neither this court, nor the circuit court should vacate the order.   From all it appears, that the circuit court was in error in its judgment, and the same is for that reason reversed.   Such court overlooked the right of the Commission to await the result of an experimental judgment.   Take from the Commission the right to experiment upon what should be a final judgment, is to rob it of its most valuable asset.   We do not feel like so ruling, and have never before so ruled.

*Reasonableness of Rates.*

The judgment of the circuit court is reversed. *White, Woodson* and *Atwood, JJ.,* concur; *Blair* and *Ragland, JJ.,* not sitting; *Walker, J.,* dissents in separate opinion.

WALKER, J. (dissenting).—Differing, as I do, from the reasoning and conclusions of the majority opinion I feel constrained, in view of the importance of the legal questions involved, to express, at some length, the grounds of my dissent from the majority opinion. In so doing I have followed, in the main, the reasoning and at times the verbiage of the original opinion filed in this case by our learned Commissioner, HIGBEE, then one of the judges of this court, in which the judgment of the circuit court was affirmed, but which opinion was not adopted, and the case was thereupon reassigned. I concurred in that affirmance and a more deliberate consideration of the facts and the law has not caused me to change my mind.

I. The Union Electric Light & Power Company entered into contracts with the several respondents own-

**Voluntary Contracts.** ing isolated buildings, to heat and light those buildings for a period of years for certain fixed prices. In the contract with the Hotels Statler Company, the price fixed for heating and lighting the building, in round numbers, was $25,000 per annum. The rates fixed by the Commission increased this sum to over $82,000. There were corresponding increases in the other cases. The increase in revenues resulting from the order of the Commission in the heating and lighting cases is estimated at $910,387 per annum.

It is claimed by the appellants that in the electric department the company was about "breaking even," but the steam heating department, it is claimed, was carried on at a tremendous deficit without any provision for depreciation.

The contract with the Ely & Walker Dry Goods Company recites that "the steam to be supplied under this contract shall be furnished by the company as a by-product of the electricity to be generated." Mr. Pierce, who negotiated the contract for the Pierce Building, testified: "The heating was a very inconsiderable part of the contract." The bond circular, on the faith of

which the company invited the public to purchase its bonds, shows that the earnings of the company for the year 1917 were $6,046,549; its operating expenses, including taxes and depreciation reserve, were $4,393,249, leaving net earnings, $1,652,600. Its net earnings for the first eight months of 1918 exceeded those for the first eight months of the year 1917. The bond circular issued by the appellant, the Electric Light Company, shows a steady, healthy improvement in the company's financial affairs. In the consideration of the questions arising in this case, this statement should have the force and effect of a judicial admission. [Steele v. Railroad, 265 Mo. 97, 116, et seq.]

In re Public Service Co. of Northern Illinois, P. U. R. 1920 C, 17, 1. c. 24, quoting from New Jersey P. U. Commissioners, P. U. R. 1918 E, 910, 915, it is said:

"An emergency for which a carrier is entitled to relief by a temporary emergency rate exists where, by reason of general conditions not affecting the applicant utility alone, the operating revenues are insufficient to operate and maintain its property and to pay rentals and interest on such of its securities, a default in the payment of which would jeopardize the solvency of the company."

The company's bond circular statutes: "Net earnings over one and one-half times all interest charges. Net earnings after bond interest equal to eleven times interest requirements."  .

We are of the opinion that the evidence demonstrates that no emergency existed justifying the Commission in abrogating the contracts entered into by the company with the relators, notwithstanding the fact that by Section 10535, Revised Statutes 1919, the burden of proof in these proceedings is on relators.

The right of private contract is safeguarded by the State and Federal constitutions. There is no question here of the State confiscating the company's property. The State, under its police power, may not increase the rates fixed by the contracts in order that the com-

pany may have a reasonable income from its investment and pay dividends to its stockholders. It can only do that, if it can in any case relieve against a contract, when it is clearly shown that the public welfare demands it in the specific case.

The company asked the Commission to increase its rates "to meet the increased cost of fuel, taxes and wages." The purpose is clearly avowed. It would have the Commission rewrite the contracts with its patrons so as to shift the increase in the burdens it has agreed to carry to the shoulders of the other parties to the contracts, and thus enable the company to earn its former profits. That, as disclosed by the record, was the object to be attained.

There was no finding, nor was there any evidence to justify a finding, that the company could not continue to perform its functions. The burden was on the company to prove that an emergency existed justifying an increase in the rates the parties had contracted should be paid. On the contrary, the evidence demonstrates that there was no emergency. In Louisiana v. Louisiana Water Co., P. U. R. 1918 B, 774, l. c. 778, our Commission said:

"While, as above stated, we hold the Commission possessed the requisite power, yet it is undoubtedly true that increasing the rates above the price at which a company solemnly agreed to furnish its commodity, and in return for which it received a permit to use the streets and a practical monopoly of the business, should not be done lightly or unless the public interest is threatened in some way if the existing rates are allowed to continue. It is entirely from this standpoint of the public interest that state regulation of public utilities has been attempted."

In Southern Iowa Electric Co. v. City of Chariton, 41 Sup. Ct. Rep. 400, decided April 11, 1921, the late Chief Justice WHITE, delivering the opinion of the court, said:

"Two propositions are indisputable: (a) that although the governmental agencies having authority to

deal with the subject may fix and enforce reasonable rates to be paid public utility corporations for the services by them rendered, that power does not include the right to fix rates which are so low as to be confiscatory of the property of such corporations'' (citing cases); ''and (b) that where, however, the public service corporations and the governmental agencies dealing with them have power to contract as to rates, and exert that power by fixing by contract rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and therefore the question of whether such rates are confiscatory becomes immaterial'' (citing cases).

The respondents contend that the order of the Commission is in violation of the terms of their contracts and a confiscation of their property without compensation in contravention of the guaranties of the Federal Constitution. The agreed facts bring these cases within the second proposition stated by the learned Chief Justice. It is controlling.

The company and the respondents voluntarily entered into contracts fixing the rates to be paid by the latter for services to be rendered at certain stipulated prices. Confiscation implies the taking of property against one's will without just compensation. Insistence upon the performance of a lawful contract voluntarily entered into cannot be viewed as confiscation. This case differs from State ex rel. v. Pub. Serv. Comm., 275 Mo. 201. In that case the State, representing the municipality, consented to change the stipulated rates. In Pawhuska v. Pawhuska Oil Co., 250 U. S. 394, Mr. Justice VAN DEVENTER quoted from New Orleans v. N. O. Water Works Co., 142 U. S. 79, as follows:

''In this case the city has no more right to claim immunity for its contract with the Water Works Company, than it would have had if such contract had been made directly with the State. The State, having authorized such contract, might revoke or modify it at its pleasure.''

II.   It is well settled that the abrogation of the terms of a private contract under the police power of the State is the exercise of a grave and dangerous power, and should be asserted only with the greatest caution and by means of every instrumentality at the command of the Commission to determine with reasonable certainty that the rate fixed in the contract injuriously affects the public welfare. It must determine that the contract between persons engaged in the particular business and well advised as to its probable effects, not only at the time, but in the light of future conditions, is so unreasonable as to be detrimental to the public interest.   [O. & C. Smelt. & R. Co. v. Public U. Comm., 187 Pac. (Colo.) 1082, 1086.]

*Public Welfare.*

The State has furnished the Commission with expert appraisers, but the company's properties were not appraised by them.  The company has for many years paid dividends on a large amount of common and preferred stock.  The company claims that it is compelled to pay increased taxes over and above the taxes upon which its rate schedules are based.  It is fairly inferable that it has deducted its Federal and State income taxes from its gross income, estimated by the company to be $103,950 for the years 1917 and 1918.  Stockholders are entitled to deduct from their personal income tax returns the income paid by the corporation from which they drew dividends.  If the corporation pays the tax as an operating expense and the stockholder deducts the tax from his return, as he has a right to do, then the patrons of the corporation pay the tax in increased rates.  The stockholder should pay this burden.  He is not entitled to more favorable consideration at the hands of the  State than any other taxpayer.  [Re Indianapolis Water Co., P. U. R. 1919 A, l. c. 478; In re Quincy R. Co., P. U. R. 1919 E, l. c. 401.]

III.   It is contended by respondents that the company, in furnishing steam heat, was performing a private and not a public service and therefore the Com-

Vol. 308]  APRIL TERM, 1925.  353

State ex rel. Washington University v. Publ. Serv. Comm.

mission had no jurisdiction to put into effect any schedule of rates for such service.

There is nothing to prevent a public utility from engaging in a private enterprise. The fact that a public utility may be performing a public service in one department, is entirely consistent with its rendering private service in another. This is illustrated in the case of the Terminal Taxicab Co. v. Pub. Utilities Commission, 241 U. S. 252. The taxicab company was authorized to operate automobiles and other vehicles and carry passengers. It operated taxicabs to and from railroad stations and to and from a certain hotel. This the court held to be a public service. It also furnished automobiles from its garage. It did not respond to all calls for this class of service. It chose its customers just as the company, through its manager, selected one building here and another there. The Commission ordered it to furnish certain information, including a statement concerning the operation of its garage. The company resisted this, contending that in operating its garage it was performing a private service; in other words, it did not profess to carry the public generally, hence the Commission had no jurisdiction to require such information. The Supreme Court upheld this contention. In the Terminal Taxicab case the court said, l. c. 254, "The important thing is what it does, not what its charter says."

The company did not profess to do a general heating business. It had no franchise to lay its pipes across the streets and alleys of the city, nor to condemn right of way across private property. It is true that it had permits from the city where its pipes were laid, but it stipulated in its contracts that such permits might be revoked. It had no schedule of rates for steam heating. The testimony of its assistant manager that he picked one building here and picked another building there, confirms the testimony of Mr. Sanderson, the electrical advisory engineer, that the company refused to heat the buildings referred to in his testimony. There was testi-

mony that, in some instances at least, the company undertook to heat a building, not as a money-making proposition, but to advertise its business. The Commission, in effect, found that the company had no schedule of rates for heating; that the suspicion of separate bargaining and of discrimination in fact was not removed and that the "effect of the schedule is to create as many classes of consumers as there are consumers." It is evident that the company, in furnishing heat to its selected customers, was not performing the functions of a public utility and that it was beyond the power of the Commission to exercise its regulatory power, impairing the obligation of the contracts with relators.

In Roach v. Danciger, 4 Mo. P. S. C. 650, the Commission said:

"The fact that defendant did not use the streets and public places of the city, so strongly urged by defendant as a reason why the business is private and not public in character, we consider of little importance. The securing of a public franchise is not determinative of whether the business is impressed with the public use."

That case came before this court for review. [See State ex rel. Danciger v. Pub. Serv. Comm., 275 Mo. 283.] At page 494, FARIS, J., said:

"There is in this case no explicit professing of public service, or undertaking to furnish lights or power to the whole public, or even to all persons in that restricted portion thereof who reside within three blocks of the company's plant. For there is in the case neither existence nor assertion of the right of eminent domain. Nor does there exist any franchise or license, nor has there been obtained from the town of Weston any right or privilege to cross the streets, alleys, or other public places therein, nor are there any charter powers authorizing the company, or the respondent, to engage in the public service. The fact of professing public service, that is, of holding himself or the company out as ready and willing to serve the public, must therefore, in

order to hold the respondent, be deduced implicitly, if it is to be found in this record at all.''

Again, at the foot of page 495: ''In the light of these considerations does the business of respondent constitute him a public utility, within the meaning of the Public Service Commission Act? We are of the opinion that it does not. For as forecast above, State regulation of private property can be had only pursuant to the police power, which power is bottomed on and wholly dependent upon the devotion of private property to a public use. If the requirement that the private property shall be devoted to a public use, before it can be regulated, and before inquisitorial authority can be exercised over it, is not to be read into the applicatory law, then that law is obviously unconstitutional, because it takes private property for public use without compensation.''

And again, at the foot of page 500: ''The rule by which a profession of public employment is to be tested, where, as here, such profession arises, if at all, implicitly, is thus laid down in a recognized work on Public Service Corporations: 'The fundamental characteristic of a public calling is indiscriminate dealing with the general public. As Baron ALDERSON said in the leading case: ''Everybody who undertakes to carry for anyone who asks him is a common carrier. The criterion is whether he carries for particular persons only, or whether he carries for everyone. If a man holds himself out to do it for everyone who asks him, he is a common carrier; but if he does not do it for everyone, but carries for you and me only, that is a matter of special contract.'' This regular course of public service without respect of persons makes out a plain case of public profession by reason of the inevitable inference which the general public will put upon it. ''One transporting goods from place to place for hire, for such as see fit to employ him, whether usually or occasionally, whether as a principal or an incidental occupation, is a common carrier.'' ' [Wyman on Pub. Service Corps., 227.]

"Testing the facts of the instant case by this rule, and by the rule announced by the majority of the courts, as well as by the reason of the thing, and the far-reaching results of any other view, rather than by the view taken by a majority of the public service commissions of the several states, we are constrained to hold that as to complainant, the respondent owed him no continuing public duty of service, and that the view taken *nisi* is correct.

"It follows that the case ought to be affirmed. Let this be done. All concur."

In State ex rel. v. Eastin, 270 Mo. 193, l. c. 206, the court in banc said: "In all such cases the franchise contracts which were so abrogated were made with the governing authorities of the annexed or absorbed municipality. . . . But nevertheless by statute or Constitution these contracts were made subject to the power or rate regulation by the authorities which granted them to the public service company affected. . . . The situation as presented by them does not turn, as in the instant case, upon a private contract running for a limited and reasonable term made with a private consumer for a valuable consideration, which consumer, by the terms of his contract, had not reserved to himself within the contract period any right of regulation, and who had behind him no statute retaining for him any power of rate regulation."

See also Public Utilities Comm. v. Telephone Association, 270 Ill. 183, 110 N. E. 334; Cawker v. Railroad Comm., 147 Wis. 320, 123 N. W. 157; Nowata Co. Gas Co. v. Henry Oil Co., 269 Fed. 742; Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238, 247.

IV.  It is insisted by relators that the Commission put into effect schedules which were discriminatory, in violation of Section 10477, Revised Statutes 1919, which reads: "No . . . electrical corporation shall make or grant any undue or unreasonable preference or advantage to any person, corporation . . . or subject

any particular person or corporation to any undue or un-reasonable prejudice or disadvantage in any respect whatsoever.''

The order applies to consumers of electric energy in the city of St. Louis using in excess of 1000 kilowatt hours per month, except customers using service sup-plied under existing contracts for water-power service and under contract with municipalities.

The testimony was that the company divided its customers off into four different classes.

(1) Domestic consumers who out of a total gross revenue of $5,684,087 for the year 1917, produced for the year $2,788,827.

(2) Consumers using 1000 kilowatt hours per month affected by the income. These consumers pro-duced a gross revenue to the company of $2,390,000.

(3) Municipalities.

(4) Users of Keokuk generated power.

(The latter two produced revenue together of $505,260).

Mr. Boehm, the company's auditor, testified at the hearing:

''The revenue from customers who are using less than 1000 kilowatt hours per month, was $2,788,827; total revenue was $5,684,087. Customers using in excess of 10000 kilowatt hours per month not included in the proposed change of rates are municipal light and power customers.

''Q. What is the reason for excluding them, al-though their quantity is in excess of 1000? A. It would not be fair to charge water-power customers on a coal basis, and the municipal contracts are excluded as the contract, I believe, runs to 1921.

''Q. What do you mean by water power? You mean energy from the Hydro-Electric Company? A. Yes; these customers purchase that energy as unrefined. I don't know the particular reasons for excluding mu-nicipal light and power corporations.

''Q. Your schedule as filed doesn't intend to apply to the municipal? A. No; it is a matter of ordinance.

It would probably require the passage of an ordinance to get anything whatever from them.''

The city had contracts running until 1921; the relators had contracts running beyond that period. The company would make fish of one and fowl of the other.

The municipality, in contracting for electric service, was acting as any other corporation in a business transaction. In exempting it as well as domestic consumers, the schedule is clearly discriminative. [Re Milwaukee E. L. & P. Co., P. U. R. 1919 A, 136, 139; Re Hagar, P. U. R. 1918 E, 451, 456.]

V.    Appellants contend that the order made by the Commission ''does not attempt to adjudicate any rights which relators may have to dispute the rates fixed by the order if in conflict with their contracts; that if sued by the company for the increased rates, they can plead their contracts and defend at law, or they may pay under protest,'' etc.   Ordinarily if a court has no jurisdiction in the premises, its judgment is a nullity and subject to collateral attack.

The orders of the Commission are merely legislative acts. Section 10522, Revised Statutes 1919, provides for a review on a writ of *certiorari* of the reasonableness or lawfulness of any order or decision of the Commission. Section 10526 provides that in all collateral actions or proceedings the orders and decisions of the Commission which have become final shall be conclusive. This question was ruled against appellants' contention in City Water Co. v. Sedalia, in an opinion in Division Two of this court, handed down on May 25, 1921.

In view of all of which I respectfully dissent from the reasoning and conclusion of the majority opinion and hold that the judgment of the circuit court in each of these cases should be affirmed.