STATE of Missouri, ex rel. AQUILA, INC., et al., Appellants,

v.

PUBLIC SERVICE COMMISSION OF the STATE of Missouri, Respondent.

Nos. WD 70788, WD 70798.

Missouri Court of Appeals, Western District.

April 20, 2010.

Sustained and Cause Ordered Transferred Aug. 31, 2010.

Case Retransferred Dec. 22, 2010.

Court of Appeals Opinion Readopted Jan. 4, 2011.

Stuart W. Conrad, Jefferson City, MO, for Appellants, AG Processing Inc. and Sedalia Industrial Energy User's Association.

Christina Lynn Baker, Jefferson City, MO, for Appellant, Office of Public Counsel.

Kevin Allen Thompson, Jefferson City, MO, for Respondent, Public Service Commission of the State of Missouri.

John Bruce Coffman, St. Louis, MO, for Respondent, AARP.

Karl Zobrist, Kansas City, MO, for Respondent, Aquila, Inc.

Before: LISA WHITE HARDWICK, P.J., and JAMES M. SMART, JR. and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

This appeal challenges a Report and Order of the Missouri Public Service Commission, as well as two subsequent Tariff Compliance Orders, issued in a rate case

initiated by Aquila, Inc.[1] AG Processing and Sedalia Industrial Energy Users Association ("Industrial Intervenors") appeal from the circuit court's affirmance of the two Tariff Compliance Orders, which found certain later-filed tariff sheets to be compliant with the Commission's Report and Order. The Office of Public Counsel separately appeals the circuit court's affirmance of the Report and Order, which approved a general rate increase for Aquila. We consolidated the appeals. Finding no error, we now affirm.

## Factual Background

Aquila initiated this case by filing tariff sheets seeking to implement a general rate increase which totaled approximately $119 million. Numerous parties intervened, including the Industrial Intervenors. After conducting an evidentiary hearing, the Commission issued a Report and Order authorizing Aquila to increase its rates, but by only approximately $59 million. The Commission's decision ordered Aquila to file revised tariff sheets in compliance with the Report and Order. Public Counsel and the Industrial Intervenors filed timely applications for rehearing of the Report and Order.

Aquila filed revised tariff sheets which the Commission, acting through a Regulatory Law Judge, ultimately approved. Public Counsel and the Industrial Intervenors filed timely applications for rehearing of the Regulatory Law Judge's two Tariff Compliance Orders. The Commission denied all applications for rehearing.

Public Counsel and the Industrial Intervenors then filed petitions for writs of review with the circuit court, which were consolidated.[2] The circuit court affirmed the Commission's Report and Order "and all other orders issued" in the case. These appeals followed.

## Standard of Review

Section 386.510 [3] provides for review of Commission orders by a circuit court "for the purpose of having the reasonableness or lawfulness of the original order or decision or the order or decision on rehearing inquired into or determined." *See also, State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 120 S.W.3d 732, 734 (Mo. banc 2003). An order's lawfulness is assessed by determining whether statutory authority exists for its issuance; all legal issues are reviewed *de novo. Id.* The reasonableness of an order "depends on whether it is supported by substantial and competent evidence on the whole record." *Id.* at 735. All factual findings of the Commission are presumed correct, "and if substantial evidence supports either of two conflicting factual conclusions, 'the Court is bound by the findings of the administrative tribunal.'" *Id.* (citations omitted).

## Analysis

### I.

The Industrial Intervenors challenge only the Commission's Tariff Compliance Orders. They allege the orders are unlawful because: (1) the Commission's authority to issue such orders cannot lawfully be

---

1. Aquila later changed its name to KCP & L Greater Missouri Operations Company; however, all parties use the name "Aquila" in their briefs, and we follow suit (both to refer to the entity as it presently exists, and to refer to predecessor entities).

2. As the caption reflects, Aquila also filed a petition for review in the circuit court, and its

suit was designated as the lead case when the multiple review proceedings were consolidated. Aquila does not raise any challenges to the Commission's rulings in this Court.

3. Unless otherwise indicated, all statutory references are to RSMo 2000 as updated through the 2009 Cumulative Supplement.

delegated to a Regulatory Law Judge; and (2) even assuming the Commission could lawfully delegate the authority to issue tariff compliance orders, under § 386.240 such a delegation had to be "expressly authorized or approved," and no such express authorization or approval occurred here.[4]

### A.

It is undisputed that the Tariff Compliance Orders at issue here were issued by a Regulatory Law Judge, and not by the members of the Commission themselves. Each Order reflects that the delegation of authority to the Regulatory Law Judge was "pursuant to Section 386.240, RSMo 2000," which provides:

Powers of commission, how exercised

The commission may authorize any person employed by it to do or perform any act, matter or thing which the commission is authorized by this chapter to do or perform; provided, that no order, rule or regulation of any person employed by the commission shall be binding on any public utility or any person unless expressly authorized or approved by the commission.

Notably, the scope of the functions which the Commission may delegate is not limited by § 386.240 in any way; instead, the statute authorizes the Commission to delegate the performance of "*any* act, matter or thing which the commission is authorized by this chapter to do or perform." (Emphasis added.) We also note that § 386.240 expressly contemplates that the Commission's delegatees may issue "or-

der[s], rule[s] or regulation[s]" binding on public utilities and other persons (so long as those actions are properly authorized or approved).

■ The Industrial Intervenors argue that the issuance of Tariff Compliance Orders is non-delegable pursuant to the Missouri Supreme Court's decision in *State ex rel. Philipp Transit Lines, Inc. v. Public Service Commission*, 552 S.W.2d 696 (Mo. banc 1977). *Philipp Transit* addressed whether the Commission "may decide a case by a report and order adopted by notational voting or whether the report and order must be acted upon at a public meeting of which notice has been given." *Id.* at 697 (footnote omitted). The Court explained that in notational voting, "each commissioner, after consideration of the circulated order, indicates approval or dissent on a notational voting sheet which accompanies the report and order. If a commissioner is not in agreement, he has various options, including requesting a conference or preparing and filing a dissent." *Id.* at 697 n. 1.

*Philipp Transit* involved the interpretation of § 386.130,[5] which provides in part:

A majority of the commissioners shall constitute a quorum for the transaction of any business, for the performance of any duty or for the exercise of any power of the commission, and may hold meetings of the commission at any time or place within the state. Any investigation, inquiry or hearing which the commission has power to undertake or to hold may be undertaken or held by or before any commissioner. All investiga-

4. We note that in *State ex rel. AG Processing, Inc. v. Public Service Commission*, 311 S.W.3d 361 (Mo.App. W.D.2010), this Court reversed on retroactive ratemaking grounds a later Commission order which approved tariff sheets submitted by Aquila which sought to adjust its rates based, in part, on fuel cost

increases occurring prior to the effective date of the Tariff Compliance Orders challenged here.

5. The text of § 386.130 has apparently remained unchanged since its enactment in 1913 through the present.

tions, inquiries, hearings and decisions of a commissioner shall be and be deemed to be the investigations, inquiries, hearings and decisions of the commission, and every order and decision made by a commissioner, when approved and confirmed by the commission and ordered filed in its office, shall be and be deemed to be the order of the commission.

In *Philipp Transit*, the Commission argued that nothing on the face of the statute required that commissioners assemble as a group to adopt orders, or prohibited notational voting. The Court rejected this argument, noting that Missouri "borrowed" the language of § 386.130 from a substantially identical New York statute, and that at the time of the Missouri legislature's action, New York courts had interpreted the borrowed statute in *People v. Whitridge*, 144 A.D. 486, 129 N.Y.S. 295 (N.Y.App.Div.1911), *aff'd*, 204 N.Y. 646, 97 N.E. 1112 (1912). *Whitridge* had held:

The body is not composed of five individuals authorized to act independently, for the act provides that "there shall be a Public Service Commission for each district."

And, while individual commissioners may hold "investigations, inquiries and hearings," *the final act must be that of the commission as a body at a meeting attended by a quorum,* and it is only for the violation of an order of the commission as such a body that a penalty can be imposed. In order that there should have been a valid order, it was necessary that it should appear that it had been adopted by the commission, acting at least by a majority, and at a stated meeting, or a meeting properly called and of which all the commissioners had been notified and had had an opportunity to be present.

*Philipp Transit*, 552 S.W.2d at 700 (emphasis added, citations omitted) (quoting *Whitridge*, 129 N.Y.S. at 298).

Industrial Intervenors seize on *Philipp Transit*'s statement that "the final act must be that of the commission as a body at a meeting attended by a quorum." According to Industrial Intervenors, this statement requires that § 386.240 be interpreted to allow delegation only of the authority to resolve interlocutory matters, not the substantive issues which will finally terminate a contested ratemaking proceeding.

We are unpersuaded. Neither *Philipp Transit,* nor the *Whitridge* decision on which it heavily relied, involved § 386.240 or any similar statute which expressly authorized the Commission to delegate the performance of "*any* act, matter or thing which the commission is authorized by this chapter to do or perform." Instead, *Philipp Transit* addressed the procedures applicable where the Commission itself acts, as a body, *not* when the Commission acts through delegatees as expressly permitted by § 386.240. Reading the quoted language from *Philipp Transit* as a gloss on § 386.240 would render the delegation statute a complete nullity, because under the literal language of *Philipp Transit,* no "valid" order enforceable against regulated entities—of *any* sort—can be issued except by action of "the commission [as a body], acting at least by a majority, and at a stated meeting." We will not read *Philipp Transit*'s interpretation of another statutory provision (§ 386.130) to completely eliminate the delegation authority plainly granted by § 386.240.

We also note that, even if *Philipp Transit* required the Commission, as a body, to perform "the final act" in ratemaking proceedings like the present one, that requirement was satisfied here. The Regulatory Law Judge's issuance of the Tariff Compli-

ance Orders was not the end of this proceeding. Instead, this proceeding was concluded by *the Commission's* rejection of Industrial Intervenors' and Public Counsel's applications for rehearing (which were filed as a precondition to judicial review under § 386.500). This was the final substantive action taken in this proceeding; Industrial Intervenors make no argument that *that* action was taken in violation of their interpretation of *Philipp Transit.*

Although § 386.240 contains no express substantive limitation on the "act[s], matter[s] or thing[s]" on which the Commission may delegate authority, we emphasize the limited scope of the purportedly unlawful delegations here. In this case, *the Commission* issued a seventy-two-page Report and Order resolving the parties' significant disputes arising out of Aquila's initial tariff filings. The Regulatory Law Judge merely issued orders subsequent to the Report and Order, which determined whether specific revised tariff filings proposed by Aquila in fact complied with the mandates and substantive standards adopted by the Commission in its Report and Order. While Industrial Intervenors argue that the Commission's Reports and Orders frequently leave significant substantive issues for resolution in connection with the filing of compliance tariffs, and while that may well be true as a general proposition, they identify *no* significant substantive issue left undecided by the Commission's Report and Order in this case which they contend the Regulatory Law Judge instead resolved. Nor do the Industrial Intervenors identify any aspect of the Regulatory Law Judge's decisions on Aquila's compliance tariffs which, in Industrial Intervenors' estimation, departed from or modified the rulings made by the Commission itself in its Report and Order.

Without more specific identification of particular (and particularly significant) substantive issues the Regulatory Law Judge decided in the Commission's stead, we reject Industrial Intervenors' claim that the act of issuing Tariff Compliance Orders is, *per se,* a non-delegable task which must in all instances be performed by the Commission. In doing so, we do not foreclose the possibility that, in a future case, the Commission's delegation of particular issues to a Regulatory Law Judge may be found to be unlawful.[6]

### B.

■ Industrial Intervenors argue in the alternative that, even if the approval of Aquila's compliance tariffs was properly delegable, no effective delegation in fact occurred here. We once again disagree.

Section 386.240 provides that, before any "order, rule or regulation" issued by a Commission delegatee can bind a utility or other person, it must be "expressly authorized or approved by the commission." The statute does not specify *when* such authorization or approval must occur; in particular, the statute does not require that au-

---

6. We note that Industrial Intervenors also argue generally that the Commission's failure to itself issue the Tariff Compliance Orders permitted the Commission to evade the requirements of the Open Meetings Law, §§ 610.010–610.035. Industrial Intervenors do not argue that *the Regulatory Law Judge's actions* themselves violated the Open Meetings Law. Moreover, as Aquila notes, this issue was not raised by Industrial Intervenors in their Applications for Rehearing of the Tariff Compliance Orders, and the issue is accordingly waived. § 386.500.2 (party seeking judicial review "shall not in any court urge or rely on any ground not so set forth in its application for rehearing"); *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n,* 186 S.W.3d 376, 389 (Mo.App. W.D.2005). We accordingly do not address the issue further.

thorization or approval occur *before* the act, matter or thing is performed. The statutory reference to "authoriz[ation] *or* approv[al]" suggests that the Commission's action may occur after the fact. While "authorize" may generally contemplate prospective empowerment to act,[7] "approve" is defined broadly enough to include after-the-fact endorsement. AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 88 (4th ed.2006) ("[t]o consent to officially or formally, confirm or sanction"); WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE 106 (1993) ("to judge and find commendable or acceptable"; "to express often formally agreement with and support of or commendation of as meeting a standard"); *see also Newport v. Hedges*, 358 S.W.2d 441, 447 (Mo. App.1962).

Thus, even if this Court agreed with Industrial Intervenors that the Regulatory Law Judge lacked appropriate *prior* authorization to issue the Tariff Compliance Orders, the orders are nevertheless sustainable if the Commission approved them after their issuance.

Here, we conclude that the Commission effectively ratified the Tariff Compliance Orders when it denied the Industrial Intervenors' applications for rehearing of those Orders. In support of their Rehearing Applications, the Industrial Intervenors made the same delegation arguments they make before this Court, as well as whatever other challenges to the orders they deemed appropriate. In its Order Denying Applications for Rehearing, the Commission specifically referenced the issuance of the Tariff Compliance Orders (which it characterized as having been issued by "the Commission"), and the filing of applications for rehearing of those orders. The Commission denied the rehearing applications, and instead left the Tariff Compliance Orders in place.

The Commission's denial of the rehearing applications, and its express reference to the earlier issuance of those orders, ratified and "expressly ... approved" the actions of the Regulatory Law Judge. We emphasize the breadth of the Commission's power to rehear an issue whenever in its judgment reconsideration is appropriate. Under § 386.500.1, "the commission shall grant and hold [a] rehearing, if in its judgment sufficient reason therefore be made to appear." Section 386.500.4 provides further that, "[i]f, after a rehearing and a consideration of the facts, ... the commission shall be of the opinion that the original order or decision or any part thereof is in any respect unjust or unwarranted, or should be changed, the commission may abrogate, change or modify the same." This Court has held that whether "[t]o grant or not grant a rehearing and permit further testimony ... is within the sound discretion of that legislative agency, to say the least." *State ex rel. Anderson Motor Serv. Co. v. Pub. Serv. Comm'n*, 234 Mo.App. 470, 134 S.W.2d 1069, 1081 (1939).[8] The Commission's refusal to exer-

---

7. *See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 121 (4th ed.2006) (defining "authorize" to mean "[t]o grant authority or power to," or "[t]o give permission for"); WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE 146 (1993) ("authorize" defined as "to endow with authority or effective legal power, warrant, or right").

8. Later decisions have noted the subsequent history, and precedential status, of *Anderson Motor:*

   After decision by the Kansas City Court of Appeals, the case was transferred to the Supreme Court of Missouri, which adopted the majority opinion of the Kansas City Court of Appeals in toto, without republishing it. *State ex rel. Anderson Motor Service Co. v. Public Service Commission*, 348 Mo. 613, 154 S.W.2d 777, 780 (1941). Thus,

cise its plenary, discretionary ability to review and reconsider the Tariff Compliance Orders, an action taken with full knowledge of the orders' issuance, was sufficient approval of the orders to satisfy § 386.240's requirements.[9]

## II.

For its part, Public Counsel challenges only a single aspect of the Commission's Report and Order: its decision to allow rate-base treatment for unamortized deferred expenses related to capital-improvement projects at Aquila's Sibley Generating Facility, which had been the subject of earlier accounting authority orders ("AAOs"). Public Counsel argues that this decision is not supported by competent and substantial evidence, is arbitrary and capricious, and results in rates that are not just and reasonable, because the Commission: (1) failed to make sufficient findings of fact to support its decision; (2) incorrectly found that the deferred balances are capital costs even though the evidence shows that the deferred balances are expenses; and (3) failed to explain why it treated the deferred balances in this case differently than it treated similar balances in another recent case.[10]

We begin with some brief (and necessarily general) background. A regulated utility's rates are established prospectively in periodic ratemaking proceedings, based on the utility's revenues and expenses during an earlier "test year." When a utility incurs extraordinary expenses (such as the construction of major capital improve-

ments) outside of a "test year," those extraordinary expenses will not be reflected in rates (because the rates were established to allow the utility to recoup its ordinary expenses, as reflected in the "test year"). An accounting authority order or "AAO" permits a utility to capture those extraordinary expenses for (potential) recovery in the forward-looking rates to be established at a future rate case (even though the extraordinary expenses may occur outside the "test year" utilized in that future rate case). As we explained in *Missouri Gas Energy v. Public Service Commission*, 978 S.W.2d 434 (Mo.App. W.D.1998), when a utility incurs extraordinary expenses associated with the acquisition or construction of a new, productive asset,

> [t]he temporary problem created is the accounting treatment of the new asset until a new rate, after a hearing and subsequent order by PSC, goes into effect. The Commission has the regulatory authority to grant a form of relief to the utility in the form of an accounting technique, an Accounting Authority Order, (hereinafter called an "AAO") which allows the utility to defer and capitalize certain expenses until the time it files its next rate case. The AAO technique protects the utility from earnings shortfalls and softens the blow which results from extraordinary construction programs. However, AAOs are not a guarantee of an ultimate recovery of a certain amount by the utility.

when we refer to the *Anderson* opinion appearing in volume 134, South Western Reporter, Second Series, we are citing an opinion ultimately adopted by the Supreme Court of Missouri.
*Woodard v. Dir. of Revenue*, 876 S.W.2d 810, 813 (Mo.App. S.D.1994).

9. Given our disposition we need not address the Commission's and Aquila's arguments

that the Commission "expressly authorized" the Regulatory Law Judge to approve the Tariff Compliance Orders in the regulation appearing at 4 CSR 240–2.120(1).

10. Notably, Public Counsel does *not* argue that affording rate-base treatment to these deferred expenses is unauthorized by law.

*Id.* at 436.[11]

Here, the Commission in fact issued AAOs permitting Aquila to capitalize certain of the expenses associated with the Sibley capital-improvement project. In rate cases subsequent to the incurrence of those costs, including the Report and Order at issue here, the Commission has permitted Aquila to recover the deferred expenses subject to the AAOs in its rates, using a twenty-year amortization schedule. Public Counsel does not dispute in this appeal the Commission's issuance of the AAOs (without which Aquila would have lost any ability to recover the Sibley-related costs through rates), or the Commission's decision to permit Aquila to recover those deferred costs in rates (piecemeal over a twenty-year amortization period). Instead, Public Counsel only challenges the Commission's decision to permit Aquila to include the unamortized portion of those deferrals in its rate base, on which it earns a rate of return. In other words, Public Counsel does not challenge the return *of* the Sibley-related costs to Aquila, over a twenty-year period, through rates; instead, it challenges the Commission's decision to allow Aquila an investment return *on* the Sibley-related costs, while it is awaiting the recovery of those costs during their twenty-year amortization.

## A.

█ Public Counsel first attacks the adequacy of the Commission's findings of fact.

Section 386.420.2 requires the commission to "make a report in writing in respect thereto, which shall state the conclusions of the commission, together with its decision, order or requirement in the premises." This requires the commission to avoid making findings of fact that are completely conclusory. Section 386.420 does not define what constitutes adequate findings of fact, but Missouri courts have filled this gap by applying § 536.090, RSMo 2000, from the state's administrative procedures statutes. The General Assembly declared in § 536.090 that the statute applies to "[e]very decision and order in a contested case," and the statute says:

> Every decision and order in a contested case shall be in writing, and except in default cases or cases disposed of by stipulation, consent order or agreed settlement, the decision, including orders refusing licenses, shall include or be accompanied by findings of fact and conclusions of law. The findings of fact shall be stated separately from the conclusions of law and shall include a concise statement of the findings on which the agency bases its order.

Whether or not the commission made adequate findings of fact is an issue of law for our independent judgment. We use a flexible standard: The findings of fact must be sufficiently definite and certain or specific under the circumstances of the particular case to enable the court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence. Findings are inadequate if they cause us to speculate as to which part of the evidence the commission believed.

*State ex rel. Pub. Counsel v. Pub. Serv. Comm'n,* 274 S.W.3d 569, 576–77 (Mo.App.

---

11. For other cases discussing the AAO mechanism, *see, e.g., State ex rel. Office of Pub. Counsel v. Mo. Pub. Serv. Comm'n,* 301 S.W.3d 556, 567–68, 569–70 (Mo.App. W.D.

2009); *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n,* 210 S.W.3d 330, 335–36 (Mo. App. W.D.2006).

W.D.2009) (other citations and internal quotation marks omitted).

We have no difficulty understanding the basis for the Commission's decision to allow rate-base treatment of the unamortized deferred expenses at issue here. We note that, in the Commission's Report and Order, there are only two sentences under the heading "Findings of Fact" which address this issue; however, there are additional findings of fact (although not denominated as such) in the Commission's preceding discussion. Those findings include the following:

- The Sibley Rebuild and the Western Coal Conversion projects "were undertaken to extend the useful life of the Sibley Generating Station by 20 years and to comply with the Federal Clean Air Act," and thereby "avoided building a new generation plant at substantially higher costs," and allowed the Sibley unit to burn low-sulfur coal to meet environmental requirements.

- Aquila chose to conduct work on these projects only in off-peak periods to avoid the need to purchase power in peak-demand periods. Although this approach provided substantial savings for Aquila's customers, it caused recovery problems for Aquila because it took several years to complete the projects.

- Two witnesses (Williams and Kolte) testified that the public policy reasons supporting the decision to grant the AAOs in this case are still applicable today and justify extending rate-base treatment to the unamortized costs.

- "Mr. Williams further testified that allowing a continuation of construction accounting of major capital projects by an AAO and including those construction costs in rate base provides an incentive for the utility to commit significant capital investment on a timely basis."

- The "Commission agrees with Mr. Williams and Mr. Kolte that the public policy analysis upon which the Commission based its decision to initially authorize the Sibley AAOs is still sound."

We find that the Commission's Report and Order on this issue contained factual findings that were sufficiently definite, certain and specific to enable this court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence.[12]

The Commission's discussion went on to observe that, in two prior decisions, "the Commission concluded these expenses were extraordinary in nature and justified the special [AAO] accounting treatment"; the Report and Order goes on to state that, in each of the earlier cases, "the Commission allowed the amortization of the expense over a 20 year period, plus the inclusion of the amortized amount in rate base." Public Counsel argues that this last statement is "just plain wrong." Public Counsel also contends that the Commission had no basis for making this

12. Public Counsel characterizes the Commission's discussion as being simply a "history of the Sibley AAOs," and a summarization of the parties' testimony on the issue. We disagree. In the cited findings the Commission found that Aquila had conferred a benefit on ratepayers by incurring the costs at issue, and chose to adopt the (identified) rationale offered by two witnesses as to why rate-base treatment of these unamortized costs furthered the public interest. This discussion was not merely a report of the prior history of these costs and the evidence presented in this ratemaking proceeding.

While a number of the findings we have described were not placed under the heading "Findings of Fact," they were "stated separately from the [Commission's] conclusions of law," as required by § 536.090.

**30**

statement, and that "the Commission's misunderstanding of this history appears to be a very significant factor in the Commission's ultimate decision to allow rate base treatment."

We agree with Public Counsel that the portion of the transcript cited by the Report and Order as support for the final quoted statement, that two prior decisions had afforded these costs rate-base treatment, is not actually supportive. As the Commission pointed out in its brief, however, the *substance* of the statement is accurate. In the first decision, the Commission plainly afforded rate-base treatment to these costs, rejecting arguments of Staff and Public Counsel against such treatment:

> The final matter to be addressed on this issue involved the length of time over which these deferred rates should be amortized and whether the unamortized portion of these costs should be reflected in rate base. Staff/Public Counsel contend that, if these costs are to be reflected in rates, they should be amortized over 20 years, the extended life of the Sibley Generating Station with the unamortized costs not reflected in rate base....
>
> ... Company contends that the unamortized portion of these costs should be included in rate base in order that Company may be compensated for the value of the money for the time occurring between the spending of the funds and their ultimate recovery.
>
> The Commission determines that these costs should be amortized over 20 years which is the approximate extended

life of the plant. The Commission finds that this approach matches the payments of the costs by the ratepayers for the rebuilding with their enjoyment of its benefits. The Commission further determines that the unamortized costs should be reflected in rate base. This is the usual practice when capital costs are amortized.[13]

In a later decision, the Commission approved the terms of a nonunanimous stipulation regarding Sibley-related costs incurred subsequent to the earlier rate case; like the earlier order, the stipulation approved by the Commission provided that those costs would " 'be reflected in rate base and amortized over a twenty-year period.' " [14]

In deciding to afford rate-base treatment to the deferred expenses at issue here, the Commission was entitled to rely on the fact that it had previously granted rate-base treatment to these costs. While it would have been preferable for the Report and Order to cite specifically to the Commission's former decisions where this rate-base treatment was authorized, we will not convict the Commission of error where the factual statement it made, and on which it relied in reaching its decision, is in fact correct.

**B.**

■ In its second point, Public Counsel argues that the Commission incorrectly found that the deferred balances are capital costs even though the evidence shows that the deferred balances are expenses. The basis for this argument is that the Commission made several statements to

13. *In the Matter of Missouri Public Service for Authority To File Tariffs Increasing Rates for Electric Service Provided to Customers in the Missouri Service Area of the Company,* 30 Mo. P.S.C. (N.S.) 320, 341 (Oct. 5, 1990).

14. *In the Matter of Missouri Public Service Proposed Tariffs To Increase Rates for Electric Service Provided to Customers in the Missouri Service Area of the Company,* 2 Mo. P.S.C.3d 230, 234 (Feb. 25, 1994) (quoting nonunanimous stipulation); *id.* at 237 (Commission approval of recovery of deferred costs on terms specified in stipulation).

the effect that the deferred costs included in the Sibley AAOs represent major capital additions to plant in service and should be treated the same way as other capital costs for these projects, and afforded rate-base treatment. Public Counsel argues that the Commission's use of the adjective "capital" to describe these costs demonstrates that it "did not understand what the issue was about."

We disagree. The Commission plainly understood the nature of the expenses comprising the unamortized balances at issue, as demonstrated by its statement that "[p]ublic counsel appears to object to the AAOs on the basis that *their balances include property taxes, carrying costs and depreciation expense* related to the originally deferred amounts." When the Commission stated that the deferred costs should be treated "the same way as other capital costs for these projects," we believe that it was referring to the fact that, by specifying that Aquila would recover those costs over a twenty-year amortization period, it had required Aquila to "capitalize" those costs in an accounting sense. "Capitalize" is defined as "[t]o include (expenditures) in business accounts as assets instead of expenses." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 276 (4th ed.2006); *see also* BLACK'S LAW DICTIONARY 238 (9th ed. 2009) ("To treat (a cost) as a capital expenditure rather than an ordinary and necessary expense.").

Moreover, the Commission's decision to afford rate-base treatment to unamortized deferred expenses—expenses which even Public Counsel acknowledges Aquila is entitled to recover—simply recognizes the proposition that when an investor's recoupment on his investment is delayed, com-

pensation for the delayed recovery may be appropriate. In a case holding that pre-judgment interest is available in cases of inverse takings, our Supreme Court has recognized that "the time value of money" is a "basic economic concept." *Akers v. City of Oak Grove*, 246 S.W.3d 916, 921 (Mo. banc 2008). Our Supreme Court has long recognized that affording a utility's investors a reasonable return on their investments is among the Public Service Commission Act's fundamental purposes. According to the Court, the Act was designed:

> to require the general public not only to pay rates which will keep public utility plants in proper repair for effective public service, but further to insure to the investors a reasonable return upon funds invested. The police power of the state demands as much. We can never have efficient service, unless there is a reasonable guaranty of fair returns for capital invested.

*State ex rel. Washington Univ. v. Pub. Serv. Comm'n*, 308 Mo. 328, 272 S.W. 971, 973 (1925).

While we do not hold that the Commission was *required* to permit this rate-base treatment, we believe that allowing recovery of a rate of return on expenses which are properly recoverable, during the delay in recovery of those expenses due to a Commission-imposed twenty-year amortization period, is a reasonable exercise of the Commission's ratemaking authority.[15]

### C.

■ Finally, Public Counsel argues that the Commission's decision is arbitrary and capricious because it conflicts with *In re Missouri Gas Energy's Tariff Sheets De-*

---

15. Public Counsel argues that, unlike other deferred expenses for which the Commission has permitted rate-base treatment, the property taxes, carrying costs, and depreciation expenses at issue here are mere "bookkeeping entries," "not actually dollars of investment capital funded by Aquila." We note, however, that Public Counsel does not challenge the PSC's issuance of the AAOs which allowed Aquila to defer these costs for consideration

signed to Increase Rates for Gas Service in the Company's Missouri Service Area, 7 Mo. P.S.C.3d 394 (Aug. 21, 1998) ("*MGE* "), and the Commission offered no explanation for its departure from *MGE's* holding.

 There are several flaws in this argument. First, as Public Counsel itself acknowledges, the PSC is not bound by *stare decisis* based on prior administrative decisions, so long as its current decision is not otherwise unreasonable or unlawful. *See, e.g., State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n,* 120 S.W.3d 732, 736 (Mo. banc 2003) ("an administrative agency is not bound by *stare decisis* "); *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n,* 186 S.W.3d 376, 390 (Mo.App. W.D.2005). In addition, Public Counsel ignores that, even if the Commission's allowance of rate-base treatment here were inconsistent with *MGE,* as we have explained above the Commission's current decision is consistent with two prior decisions *involving the very same costs at issue here.* The Commission could hardly be faulted for failing to follow a decision involving a different utility, and a different set of facts, where its decision adheres to earlier rulings involving precisely the same factual scenario.

*MGE* is, in any event, distinguishable. There, in disallowing rate-base treatment of certain unamortized deferred costs, the Commission emphasized that it was allowing MGE to amortize the deferred costs at issue over a ten-, rather than twenty-, year period, and that in exchange for this shorter cost-recovery period MGE would be denied rate-base treatment of the unamortized portion of those costs: "[g]iven that the Company will recover the amortized amount of the SLRP deferral ... in ten years, instead of the previous 20 years' amortization period, it is proper for the ratepayers and shareholders to share the effect of regulatory lag by allowing the Company to earn a return of the SLRP deferred balance but not a return on the SLRP deferred balance." 7 Mo. P.S.C.3d at 408. Here, Aquila was given no similarly abbreviated amortization period.

### Conclusion

Because the Commission's Report and Order and Tariff Compliance Orders were lawful and reasonable, we affirm.

All concur.

in a subsequent rate case, or the PSC's establishment of a twenty-year amortization period over which Aquila would be permitted to recover these costs in rates. Given Public Counsel's acknowledgment that the costs are in fact properly recoverable, and in light of the policy considerations which animated the Commission's decision to afford these costs rate-base treatment, we do not believe the precise nature of the deferred costs at issue affects the propriety of the Commission's decision.

We also note that Public Counsel relies on the Missouri Supreme Court's decision in *State ex rel. City of St. Louis v. Public Service Commission,* 341 Mo. 920, 110 S.W.2d 749, 776–77 (1937), in support of its claim that rate-base treatment of Aquila's unamortized,

deferred Sibley-related costs was inappropriate. As reflected in its citation of *Kansas City Southern Railway Co. v. United States,* 231 U.S. 423, 456, 34 S.Ct. 125, 58 L.Ed. 296 (1913), however, *City of St. Louis* apparently rejected only the utility's contention "that such outlays as this should be capitalized and that consumers should pay a rate of return on them *forever.*" 110 S.W.2d at 777 (emphasis added). Instead, the court held that the costs at issue "may be charged to operating expenses and amortized where necessary." *Id.* The court did not address whether unamortized costs could themselves be entitled to rate-base treatment until recouped in rates, and it certainly established no *per se* rule prohibiting rate-base treatment of such costs pending their recovery.